IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Leslie J. WEBSTER, Attorney at Law.

OFFICE OF LAWYER REGULATION, f/k/a Board of Attorneys Professional Responsibility, Complainant,

v.

Leslie J. WEBSTER, Respondent.

Supreme Court

*No. 98–0677–D. Submitted on briefs March 11, 2002.—Decided July 11, 2002.*

2002 WI 100

(Also reported in 647 N.W.2d 831.)

ATTORNEY reinstatement proceeding. ■■■■■

For the respondent there were briefs by *Daniel W. Hildebrand* and *DeWitt Ross & Stevens S.C.*, Madison.

For the complainant there was a brief by *Frank M. Tuerkheimer* and *LaFollette Godfrey & Kahn*, Madison.

¶ 1. PER CURIAM. Leslie J. Webster appealed from the referee's findings of fact, conclusions of law, and recommendation that the petition for reinstatement of his license to practice law in this state be denied. Webster's license was suspended on January 21, 1998, for two years following his felony conviction in federal court on the charge of aiding and abetting the fraudulent concealment of a debtor's property from a bankruptcy trustee. *In re Disciplinary Proceedings Against Webster*, 217 Wis. 2d 371, 577 N.W.2d 21 (1998). Webster was incarcerated as a result of that conviction from December 18, 1997, until January 15, 1999.[1]

---

[1] On December 16, 1999, Webster petitioned for reinstatement and that petition, pursuant to the procedure then in effect under the Board of Attorneys Professional Responsibility, was referred to the District 5 Professional Responsibility Committee for a public hearing and report. On July 12, 2000, that committee filed its report concluding that although Webster had engaged in the practice of law during the period of his suspension and therefore had not demonstrated by clear and convinc-

¶ 2. After a public hearing on Webster's reinstatement petition the referee issued a report making specific findings of fact and conclusions of law. First, the referee concluded that Webster had not complied with the requirements of SCR 22.26(1)(a)[2] in that he failed

ing evidence his full compliance with the terms of the suspension order, the committee nevertheless recommended his reinstatement because, in its view, to do otherwise would result in unjustifiable harshness. *See In re Disciplinary Proceedings Against Eisenberg,* 96 Wis. 2d 342, 291 N.W.2d 565 (1980).

Effective October 1, 2000, Wisconsin's attorney disciplinary process was substantially restructured. The name of the body responsible for investigating and prosecuting cases involving attorney misconduct was changed from the Board of Attorneys Professional Responsibility (BAPR) to the Office of Lawyer Regulation (OLR) and the supreme court rules applicable to the lawyer regulation system were also revised in part. Although this case arose and was processed under the former BAPR procedures, and even though the District 5 Professional Responsibility Committee had made a favorable recommendation, on January 29, 2001, this court, at Webster's request, assigned the reinstatement petition to a referee noting that if Webster's petition for reinstatement had been filed under the new OLR procedural rules, a referee would have been appointed. SCR 22.30. This court further noted that even under the former BAPR procedures, reinstatement petitions could be referred to a referee. *See* [former] SCR 21.11 and *In re Disciplinary Proceedings Against Eisenberg,* 96 Wis. 2d 342, 291 N.W.2d 565 (1980). This court directed that the referee proceed under the new provisions applicable to reinstatement petitions, SCR 22.29 to 22.33. The referee held a public hearing and subsequently on August 27, 2001, filed her report recommending that Webster's petition for reinstatement be denied.

[2] SCR 22.26(1)(a) provides:

> (1) On or before the effective date of license suspension or revocation, an attorney whose license is suspended or revoked shall do all of the following:

to notify all clients whose funds he held in trust of his suspension; further, the referee determined that Webster had not complied with the requirements of SCR 22.26(2)[3] in that he had practiced law during the term of his suspension. In addition, the referee concluded that Webster had not demonstrated by clear, satisfactory, and convincing evidence that he had the moral character to practice law in this state and that his resumption of the practice of law would not be detrimental to the administration of justice or subversive of the public interest; and finally, the referee concluded that Webster had not demonstrated that he had met the requirements for reinstatement. SCR 22.31(1).[4] Accordingly, the referee recommended that Webster's petition

---

(a) Notify by certified mail all clients being represented in pending matters of the suspension or revocation and of the attorney's consequent inability to act as an attorney following the effective date of the suspension or revocation.

[3] SCR 22.26(2) provides:

(2) An attorney whose license to practice law is suspended or revoked or who is suspended from the practice of law may not engage in this state in the practice of law or in any law work activity customarily done by law students, law clerks, or other paralegal personnel, except that the attorney may engage in law related work in this state for a commercial employer itself not engaged in the practice of law.

[4] SCR 22.31(1) provides:

(1) The petitioner has the burden of demonstrating by clear, satisfactory and convincing evidence that the petitioner has the moral character to practice law in Wisconsin, that the petitioner's resumption of the practice of law will not be detrimental to the administration of justice or subversive of the public interest, and that the petitioner has complied fully with the terms of the order of suspension or revocation and with the requirements of SCR 22.26.

for reinstatement of his license to practice law in this state be denied. The referee wrote:

> Considered individually, some of petitioner's transgressions are relatively minor and would not lead to the recommendation I am making. However, when viewed as a whole, they evince the continuation of a long-standing pattern—a pattern demonstrating a lack of appreciation for and understanding of basic legal principles as well as the rules governing an attorney whose license has been suspended. Put another way, petitioner's conduct demonstrates his willingness to "play fast and loose" with the rules and to "cut corners" when petitioner deems it suitable to his purpose. Moreover, when confronted with claims of inappropriate conduct, petitioner's response has largely been to either blame that conduct on someone or something other than himself, or to denominate it as a mere, and minor, error of judgment that could be made by anyone.
>
> . . . .
>
> If only one or even two of these transgressions was at issue, I, like the referee in *Eisenberg* and the District 5 Committee, could very well have a different recommendation to submit to the court. However, this is a case where the whole is greater than the sum of its parts, and given this whole, I am compelled to recommend that reinstatement be denied.

¶ 3.   After a review of the record we conclude that the referee's factual findings are not clearly erroneous. In addition, we agree with the referee and conclude that Webster has not satisfied his burden under SCR 22.31 to demonstrate by clear, satisfactory, and convincing evidence that he has the moral character to practice law in this state, that his resumption of the practice of law would not be detrimental to the administration of justice or subversive of the public interest, and that he

has complied fully with the terms of his suspension and the requirements of SCR 22.26. We believe that Webster's activities during his suspension demonstrate that he either failed to comprehend what was expected of him in order to obtain reinstatement or that he knew full well what was required but chose to, as the referee described it, " 'play fast and loose' with the rules [and] to 'cut corners' when [he] deem[ed] it suitable to his purpose." The former raises serious question about Webster's competence to resume the practice of law in this state and the latter raises just as serious question about his fitness to practice law. In either case we conclude that Webster has not met his burden under SCR 22.31 and, accordingly, we deny his petition for reinstatement.

¶ 4.   Because we find that the referee's findings are not clearly erroneous and that any one of the findings standing alone support our denial of Webster's petition for reinstatement, we need not discuss in detail all of the referee's extensive findings in this matter. We focus primarily on Webster's activities during the period of his suspension. First, based on the referee's findings, we conclude that Webster continued to practice law during his suspension when he filed and prosecuted in the circuit courts of this state three foreclosure actions as trustee of his parents' revocable inter vivos trust.

¶ 5.   Second, we agree with the referee that the numerous occasions when Webster repeatedly deposited or withdrew monies from his IOLTA trust account, reflected an attitude that, despite his suspension, it was simply "business as usual." Although Webster's activities involving his IOLTA trust account may not, standing alone, constitute the practice of law, they do reveal a certain cynicism or "skating on the edge" style that is

328

inconsistent with what is expected from a suspended lawyer who wants to be reinstated.

¶ 6. And third, we conclude that Webster's actions of listing himself as an attorney in a local phone directory published before his two-year suspension period had ended and before he had been reinstated, along with his continued use of his law office checks during his imprisonment and suspension, preclude any finding that he has the moral character to practice law and that his reinstatement would not be detrimental to the administration of justice or subversive of public interest. Again we note that although those actions standing alone may not constitute the practice of law, taken in combination they demonstrate Webster's failure to meet his burden to show that he is both competent and fit to resume the practice of law in this state. As the referee aptly observed, this is a case "where the whole is greater than the sum of its parts," and on the whole we are not convinced that Webster should be reinstated at this time.

¶ 7. Leslie J. Webster was licensed to practice law in Wisconsin in 1979 and has practiced in Ellsworth, Wisconsin, primarily as a sole practitioner under the firm name of Oltman & Webster, Ltd.; Oltman had not been actively engaged in the practice during the times material to these proceedings. Webster was publicly reprimanded in 1990 for undertaking the representation of a client in a matter in which Webster had a conflict of interest by virtue of his intimate relationship with the client's wife. *In re Disciplinary Proceedings Against Webster,* 154 Wis. 2d 110, 452 N.W.2d 374 (1990).

¶ 8. On January 21, 1998, this court suspended Webster's license to practice law for two years following his felony conviction and two-year prison sentence

329

imposed in federal court. *In re Disciplinary Proceedings Against Webster,* 217 Wis. 2d 371, 577 N.W.2d 21 (1998).

¶ 9. Webster petitioned this court on December 16, 1999, seeking reinstatement and as noted above, the matter was subsequently sent to a referee for a hearing and report. We will discuss certain findings made by the referee that support our conclusion that Webster's reinstatement petition must be denied.

## FORECLOSURE ACTIONS

¶ 10. The referee found that between June 1998 and March 2000 Webster filed and prosecuted three foreclosure actions[5] as a trustee of a revocable inter vivos trust of which his parents are lifetime beneficiaries and in which he and his sisters are residuary beneficiaries. These foreclosure actions were brought in Pierce County, Polk County, and Burnett County Circuit Courts. In all three actions Webster appeared in a fiduciary capacity representing the legal interest of the trust and/or the trust beneficiaries. The referee found that in those three foreclosure cases Webster subsequently sought and was awarded fees and costs for his services as trustee in prosecuting the foreclosure actions. Webster's fees totaled approximately $4600, and he was awarded costs in addition to those fees.

¶ 11. The referee further determined that although none of the circuit court judges in the foreclosure actions questioned whether Webster's appearance in a representative or fiduciary capacity as a trustee

---

[5] There was an additional foreclosure action which Webster commenced as a guardian for his children. The OLR does not now contend that that constituted the practice of law; accordingly, this opinion does not discuss that action.

330

constituted the practice of law, the circuit court judge in the Polk County action questioned the fee Webster requested calling it " . . . nothing more than a thinly-veiled attempt to obtain fees at the rate normally charged by an attorney practicing this type of law in this area. To allow this would be a sham with regard to the order previously entered suspending Mr. Webster's right to practice law."

¶ 12.   Subsequently the circuit court in the Polk County case, substantially reduced the fee awarded Webster in that foreclosure action. His fees in the other two foreclosure cases were awarded in the amount he requested.

¶ 13.   The referee further found that prior to commencing these foreclosure actions Webster had not asked BAPR whether his conduct would constitute the practice of law. However, in September 1999 a defendant in one of those foreclosure actions contacted the United States attorney's office and Webster's federal supervised release officer questioning whether Webster's activities on behalf of the trust in that foreclosure action constituted practicing law. After that question was raised Webster contacted the district attorney's office in the county where that action was pending and secured an opinion from the district attorney that Webster's activities on behalf of the trust in the foreclosure action did not violate the proscriptions in Wis. Stat. § 757.30 (1999–2000) against practicing law without a license.[6]

---

[6] Wisconsin Stat. § 757.30(2) provides:

(2) Every person who appears as agent, representative or attorney, for or on behalf of any other person, or any firm, partnership, association or corporation in any action or proceeding in or before any court of record, court commissioner, or judicial tribunal of the United States, or of any state, or who otherwise, in

¶ 14. In addition, the referee determined that it was more than 15 months after Webster filed the first of the foreclosure actions, and then only after the question was raised by the United State's attorney's office, that Webster contacted the State Bar's Ethics Hotline seeking advice about whether his activities on behalf of the trust constituted practicing law; the Hotline declined to give advice about whether Webster's activities in the foreclosure cases constituted the practice of law.

¶ 15. According to the referee, Webster's activities as trustee on behalf of the trust in the foreclosure cases contravened the holding in *Life Science Church v. Shawano County,* 221 Wis. 2d 331, 585 N.W.2d 625 (Ct. App. 1998). The referee noted that the court of appeals in *Life Science Church,* citing *Jadair Inc. v. United States Fire Insurance Co.,* 209 Wis. 2d 187, 562 N.W.2d 401 (1997), and cases from other jurisdictions, held that trustees may appear in Wisconsin courts without licensed legal counsel only to represent the trustee's own legal interest in his or her individual capacity; a trustee, who is not licensed to practice law, may not, however, represent the legal interests of the trust or trust beneficiaries in a representative fiduciary capacity as trustee. *Life Science Church,* 221 Wis. 2d at 334. Furthermore, according to the *Life Science Church* court, this court in *Jadair* recognized that non-lawyers who attempt to speak for the legal interests of others are engaged in the unauthorized practice of law. *Id.* at

or out of court, for compensation or pecuniary reward gives professional legal advice not incidental to his or her usual or ordinary business, or renders any legal services for any other person, or any firm, partnership, association or corporation, shall be deemed to be practicing law within the meaning of this section.

All subsequent references to the Wisconsin Statutes are to the 1999–2000 version, unless otherwise indicated.

333. The referee determined that despite the "crystal clear" holding in *Life Science Church,* Webster nevertheless prosecuted the three foreclosure actions on behalf of the trust and beneficiaries in his representative fiduciary capacity after his license to practice law had been suspended.

¶ 16. In testimony before the referee Webster acknowledged that he had not read the *Life Science Church* case until the spring of 2000—after he had already commenced and prosecuted the foreclosure actions. Webster claimed that he was unaware of the *Life Science Church* decision when he filed the foreclosure actions because he had cancelled his subscription to the *Wisconsin Reports* after his license had been suspended and he did not have access to that case while in prison. According to Webster, the research he did on the subject of practicing law while under suspension only revealed two cases: *In re Disciplinary Proceedings Against Eisenberg,* 126 Wis. 2d 435, 446, 337 N.W.2d 160 (1985), and *In re Disciplinary Proceedings Against Eisenberg,* 96 Wis. 2d 342, 291 N.W.2d 565 (1980). Webster believed that both of those cases supported his understanding that although he could not represent a corporation while under suspension, there was nothing barring him from representing a trust in which he was the trustee and beneficiary. Webster noted that Wis. Stat. § 757.30 contains no specific reference or prohibition against a fiduciary trustee representing a trust.

¶ 17. In addition, in his testimony before the referee, Webster claimed that he had relied on the district attorney's opinion that filing the foreclosure cases in a representative capacity as a trustee, did not constitute the practice of law without a license. Webster also observed that none of the judges in the foreclosure actions questioned whether his appearance constituted

the practice of law. And, finally, Webster explained that he had not contacted BAPR to obtain an opinion on whether his activities would constitute practicing law, because he did not think that BAPR would give him an opinion on the subject.

¶ 18.   Webster's explanations did not persuade the referee that he had not been practicing law during his suspension. In the first place, according to the referee, Webster could have easily found the *Life Science Church* decision had he done basic legal research on the issue; the referee thought that his failure to do so cast doubt on Webster's competence as a lawyer.

¶ 19.   Moreover, the referee found that Webster's reliance on the two *Eisenberg* disciplinary decisions was misplaced because those cases did not address the issue of whether a trustee, who does not have a law license, may appear in courts in this state on behalf of a trust.

¶ 20.   Similarly, the referee said that while Webster may have taken some comfort from the district attorney's favorable opinion, if Webster had conducted his own research, he would have discovered that the district attorney's opinion was clearly wrong in light of *Life Science Church*. The referee also reasoned that Webster should draw little solace from the fact that none of the judges before whom he appeared in the foreclosure actions questioned whether he was practicing law; according to the referee, it was Webster's responsibility, not someone else's, to make certain that his conduct during the suspension conformed to the rules against practicing law.

¶ 21.   The referee also found it significant that Webster's inquiries into whether his activities on behalf of the trust constituted the practice of law, occurred only after the United States attorney's office and

Webster's federal supervised release officer questioned whether he was practicing law.

¶ 22. On appeal Webster reiterates his argument that by prosecuting the three foreclosure matters as a trustee, he was not practicing law as that term is used in Wis. Stat. § 757.30 and SCR 22.26(2). Webster points out that the words "trust, fiduciary, principal or any other reference to legal actions taken on behalf of a principal" are conspicuously absent from both Wis. Stat. § 757.30 and SCR 22.26(2). According to Webster, had the legislature intended to preclude a trustee from commencing and maintaining legal actions on behalf of a trust without enlisting the services of an attorney, the legislature could have easily so provided in the statute.

¶ 23. Furthermore, Webster maintains on appeal that despite the referee's description of the holding in *Life Science Church* as "crystal clear," Webster believed it was not—especially when applied to a trustee of an inter vivos trust. Webster contrasts his actions as trustee of the inter vivos trust with the actions of the trustees in the *Life Science Church* case. Here Webster notes that he actually held title to the property, was authorized by the trust to prosecute legal actions on behalf of the trust, and had been appointed by the settlers of the trust to safeguard their asserts and to hold, manage, and distribute them. According to Webster, in bringing the three foreclosure actions as trustee on behalf of the trust, he was simply fulfilling his duties as trustee; he was not practicing law.

¶ 24. We are not convinced. The distinction Webster attempts to draw between a trustee of a church, like that involved in *Life Science Church* case, and a trustee of an inter vivos trust, is not as persuasive as Webster would have it. In any event, had Webster simply read the *Life Science Church* case or this court's

335

decision in *Jadair*—both of which were issued before Webster filed the first foreclosure action on behalf of the trust—he would have been put on notice that his activities on behalf of the trust could be construed as practicing law.

¶ 25.    Recently in *In re Disciplinary Proceedings Against Hyndman,* 2002 WI 6, 249 Wis. 2d 650, 638 N.W.2d 293, this court discussed the prohibition in SCR 22.26(2) against a suspended or revoked attorney practicing law. *Hyndman* recognized that if certain acts would not constitute practicing law for a non-lawyer, then those same acts would not constitute practicing law for a person whose license to practice law had been revoked or suspended. In view of the holding in *Life Science Church* that a trustee must appear in Wisconsin courts with licensed legal counsel unless the trustee is acting solely in an individual capacity, it is apparent that Webster's activities as trustee on behalf of the trust in the three foreclosure actions could not have been performed by a non-lawyer. The trustee in *Life Science Church* could not file a notice of appeal on behalf of the trust; similarly, Webster as trustee of the inter vivos trust could not commence and prosecute the foreclosure actions on behalf of the trust and beneficiaries. When Webster acted on behalf of the trust by filing and prosecuting the foreclosure actions he was practicing law. We believe that the referee correctly determined that Webster's activities constituted the practice of law. At the very least, he should have checked with BAPR before he filed the foreclosure actions. The referee's determination that Webster was practicing law when he commenced and prosecuted the foreclosure actions is not clearly erroneous.

## OFFICE CHECKS

¶ 26. The referee determined that prior to his suspension, Webster had maintained a business checking account at a local bank under the name of "Oltman & Webster, Ltd., Attorneys at Law." That account remained open after his suspension and between June of 1998 and May of 1999 more than 300 checks were drawn on that account.

¶ 27. In his testimony before the district professional responsibility committee, and again before the referee, Webster asserted that his legal assistant wrote all the office checks. He claimed that he was "surprised" that she continued to use that account after his suspension and imprisonment. Furthermore, he pointed out the "Attorneys at Law" designation on the checks was in small print. And, Webster noted that he had derived no benefit from the continued use of these checks while under suspension.

¶ 28. Again the referee was not persuaded by Webster's explanations. The referee said that Webster should not have held himself out as an attorney by using those checks even if he derived no legal business from their use; moreover, the referee found Webster's willingness to blame his legal assistant for this oversight to be unacceptable. According to the referee, it was Webster's responsibility to ensure that he complied with the rules governing one whose license had been suspended. The referee recognized that although this infraction, standing alone, would not be "terribly serious," it evinced a less than scrupulous attitude on Webster's part toward compliance with the rules governing reinstatement.

¶ 29. On appeal Webster emphasizes the referee's description of this infraction as not being "terribly

serious." Furthermore, he disputes the referee's belief that he was blaming his assistant. According to Webster, he had instructed his assistant to remove all indicia of law practice including scraping the words "Law Office" off the window of his office. He suggests that his assistant might have continued to pay the bills with the office checks because it simply escaped her notice and did not occur to her to order new office checks. Webster insists that he was unaware that the checks were used during his suspension and again he points out that he derived no legal business from the use of those checks.

¶ 30. We too are not persuaded by Webster's arguments. We note that these checks were used not only while Webster was in prison, but also after he had been released from prison. At that point, if not earlier, he should have been overseeing the use of the checks in his office.

¶ 31. Moreover, Wis. Stat. § 757.30(3) provides that every person " ... who in any other manner represents himself or herself either verbally or in writing, directly or indirectly, as authorized to practice law in this state, shall be deemed to be purporting to be licensed to practice law as an attorney within the meaning of this section." We think that using office checks with the designation "Attorneys at Law" imprinted on them—even if in small print—is a representation to the public that the drawer of the check is a lawyer or law office. The referee's findings in this respect are not clearly erroneous. These acts by Webster plus his placing the phone directory advertisement listing his law office before his suspension ended (discussed below) reflect a cynical attitude inconsistent with the high ethical standards we expect from those admitted to practice law in this state. Although these

actions might not constitute practicing law, we conclude they refute any claim by Webster that he has met his burden under SCR 22.21 to obtain reinstatement.

## YELLOW PAGES AD

¶ 32.   The referee determined that in late 1999 Webster placed an advertisement for his law office in the Yellow Pages of the local telephone book. That ad appeared in the phonebook distributed early in January of 2000 which was several weeks before the two-year anniversary date of this court's January 21, 1998, suspension order.

¶ 33.   At the hearing before the referee Webster claimed that he had assumed that the order suspending his license for a period of two years would expire at the end of that two-year period on January 21, 2000, and that he would then be "automatically reinstated" on that date. He also said that if a potential client had called in response to the ad prior to the time of his anticipated "automatic" reinstatement, he would have simply referred that person to another attorney.

¶ 34.   The referee was critical of Webster's failure to undertake any research concerning the reinstatement rules. The referee said that by simply reading SCR 22.28(3),[7] or by simply contacting BAPR, Webster

---

[7] Former SCR 22.28(3) provided, in part:

(3) An attorney whose license is revoked, suspended for 6 months or more for misconduct, or suspended for medical incapacity shall not resume practice until the license is reinstated by order of the supreme court. A petition for reinstatement from a suspension for a definite term may be filed at any time commencing 3 months prior to the expiration of the suspension period. . . .

Current SCR 22.28(3) provides that "(3) The license of an attorney that is revoked or suspended for misconduct for six

would have discovered that his reinstatement would not be automatic. According to the referee, Webster's explanation that he assumed he would be automatically reinstated was either "wholly disingenuous" or, as Webster himself termed it, "incredibly stupid." The referee wrote:

> One would think that a lawyer whose license has been suspended and who desires to practice law again would have at least a passing familiarity with the rules governing reinstatement. After all, one's livelihood as an attorney depends upon it. Even if one accepts petitioner's testimony that he truly thought his license would be automatically reinstated, his failure to make certain [of that] demonstrates a basic lack of competence which does not advance his claim that reinstatement would not be detrimental to future clients.
>
> In addition, petitioner's willingness to place an ad that he knew would appear in print before January 21, 1998 [sic] is yet another example of his willingness to cut corners when it suits his purpose.

¶ 35. On appeal Webster concedes that placing the ad was "incredibly stupid"; he claims, however, that it resulted from his failure to understand the amount of time it would take to obtain reinstatement. Again, Webster notes that he derived no legal business from the ad and he accepts the referee's criticism that he should have read the reinstatement rules before placing the ad.

¶ 36. We believe, as OLR maintains, that there is nothing ambiguous about SCR 22.28(3). Neither the former version nor the current version of this reinstate-

months or more shall be reinstated pursuant to the procedures set forth in SCR 22.29 to 22.33 and only by order of the supreme court."

340

ment provision can be read to support a reasonable belief that an attorney whose license to practice law has been suspended for two years would be automatically reinstated at the end of that two-year period. Furthermore, as OLR points out in its brief, Webster's ad in the Yellow Pages identifying him as an attorney was distributed in the January 1, 2000, edition of the Yellow Pages; that was three weeks before Webster himself thought his suspension period would end and his license would be automatically reinstated.

¶ 37. As discussed above, Webster's check writing and placing the telephone ad reflect a cavalier attitude on his part toward the standards of behavior needed to gain reinstatement. These acts demonstrate that Webster has failed to meet his burden of proof under SCR 22.31(1) to obtain reinstatement of his license. Webster's repeated lapses in judgment reflected by these actions support our decision to deny his reinstatement petition.

## TRUST ACCOUNT ACTIVITIES

¶ 38. The referee made specific findings with respect to the large number of deposits or withdrawals in Webster's trust account during his suspension. The referee noted that as of June 2000 Webster's IOLTA trust account remained open; furthermore, between the time of his suspension in January of 1998 and the end of 1998, eight deposits totaling $97,527.01 had been made into that account. In addition, the referee found that at least 30 checks had been written on that account from the time of Webster's suspension to the end of 1998; the balance in the account at the end of 1998 was $8751.32. The referee determined that although the deposits and disbursements into the account had been

made by Webster's legal assistant, she had acted under Webster's supervision by telephone while he was in prison.

¶ 39. In addition, the referee found that after Webster was released from prison, he restated the Articles of Incorporation for Oltman & Webster to provide that the firm offered accounting services rather than legal services. However, according to the referee, Webster maintained his same IOLTA account after that corporate restatement. The referee determined that during 1999, deposits into that account totaled $222,549.47 and disbursements from the account totaled $214,957.44, leaving a balance in Webster's IOLTA account as of June 2000 of $7876.94.

¶ 40. In argument before the referee Webster asserted that his continued use of his IOLTA trust account during his suspension was permissible because there was no specific rule requiring an attorney to close his or her trust account during periods of suspension. In addition, Webster asserted that his fiduciary duty to his clients required him to maintain the trust account to safeguard his clients' funds.

¶ 41. Although the referee acknowledged that there was no rule mandating that a lawyer must close his or her trust account during a period of suspension, the referee noted that SCR 22.26(2) explicitly prohibited Webster from practicing law during the period of suspension. The referee wrote:

> Logic, alone, would appear to dictate that depositing money into and disbursing monies from a trust account is the practice of law. After all, the money in a trust account are [sic] derived from the practice of law, and the "movement" of money into and from such an account is a necessary part of the practice of law.

¶ 42. It was even more significant, according to the referee, that the "spirit" of the rule against practicing law during a period of suspension, prohibited any activity during suspension that a person would have regularly engaged in as a licensed practicing attorney. The referee believed that Webster's maintaining and utilizing his trust account was just such an activity. The referee wrote:

> This is not a situation in which petitioner disbursed or transferred all of the monies in his trust accounts after his suspension and simply left the accounts open with a balance of $0. Nor is it a situation where the monies in the trust accounts at the time of suspension simply remained there with no additions or subtractions. If one of these two situations existed herein, my conclusion might be different. In this case, however, petitioner or petitioner's legal assistant under petitioner's supervision, actively moved money into and out of these accounts. Such activity certainly violates the intent of the prohibition against practicing law during the term of suspension.

¶ 43. Nor was the referee persuaded by Webster's other proffered explanation for keeping his trust account open—i.e., the protection of his clients' funds. The referee pointed out that Webster could have transferred all of the funds in his trust account to another attorney's trust account where they would have been equally safe. Although the referee said that would have required the consent of the client and the other attorney, in view of the fact that Webster had been able to make arrangements to transfer his active client files to other attorneys, the referee thought Webster could have made a similar arrangement to transfer his trust account funds. And, even if he could not, again, the

referee said that Webster should have contacted BAPR to ascertain what he should have done with the trust account funds.

¶ 44.   On appeal Webster argues that there is nothing in the prohibition in SCR 22.26 against practicing law while under suspension that would require a suspended attorney to close his or her trust account, nor is there anything in the rule requiring the attorney to disburse all the funds held by the attorney as a trustee. Webster points out that there have been no allegations that he abused his trust account in any way; rather, the only allegation was that the considerable deposit and withdrawal activity in his trust account during his period of suspension violated the "spirit" of SCR 22.26. According to Webster, simply because an attorney has been suspended, that does not relieve that attorney of the fiduciary responsibility the attorney accepted when receiving funds for others for deposit into the attorney's trust accounts. In this respect, Webster notes that the District 5 Professional Responsibility Committee found that it was "appropriate" for him while under suspension to maintain his trust account with respect to monies that were in dispute on matters involving his former clients and third-party claimants. According to the committee, it would not be "realistic" to expect an attorney's trust account to be closed upon suspension.

¶ 45.   Webster also asserts that although the referee acknowledged that there was no explicit requirement that a suspended attorney must close his or her trust account, the referee incorrectly reasoned that simply maintaining a trust account constitutes the practice of law. Webster complains that this "novel proposition" ignores the fact that numerous other individuals and entities such as real estate brokers, title

344

companies, escrow agents, etc., also utilize trust accounts as a regular part of their businesses. According to Webster, a trust account is nothing more than a dedicated bank account into which funds belonging to others are deposited.

¶ 46. Although Webster concedes that some of the monies he held in his trust account at the time of his suspension had been derived from his practice of law, he maintains that if the mere movement of funds from such an account constituted the practice of law as the referee believed, then an attorney's trust account would always be frozen at the time of suspension; that would mean, Webster argues, that the suspended attorney would thereafter be unable to disburse any funds from that account without violating the rule against practicing law. Webster insists that SCR 22.26 was not intended to prohibit a suspended attorney from engaging in all activities he or she would have regularly engaged in as a licensed practicing attorney; rather, the rule is intended to prohibit a suspended attorney from engaging in activities which require a license to practice law. In this respect, he contends SCR 22.26(2) is not intended to prohibit a suspended attorney from working as an accountant, tax return preparer, real estate broker, title insurance agent, or in any other occupation where, as part of that occupation, the suspended attorney may do work which is also done by an attorney and which may require a trust account.

¶ 47. In response OLR argues that the deposits and withdrawals from Webster's IOLTA account—admittedly all done by Webster's legal assistant but under Webster's telephonic supervision from prison—were activities that only an attorney could engage in and therefore constituted the practice of law. Moreover, OLR points out that the referee did not, as Webster

contends, find that Webster was required to close his account; rather, the referee viewed the numerous transactions in Webster's trust account as demonstrating his attitude that it was simply "business as usual" despite his suspension.

¶ 48.   We agree with Webster that SCR 22.26(2) is not intended to prohibit a suspended attorney from engaging in any activity he or she could have engaged in as a licensed practicing attorney; rather, that rule is simply aimed at prohibiting a suspended attorney from engaging in activities which require a license to practice law or which are customarily done by law-related personnel such as law clerks, law students, or paralegals. As noted above, in *Hyndman,* this court said that if acts would not constitute practicing law for a non-lawyer, then those same acts would not constitute practicing law for a lawyer whose license to practice has been revoked or suspended. Webster's activities in transferring funds in and out of his trust accounts, while undoubtedly a component of practicing law, are not necessarily something that could only be done by a person who has a license to practice law. Transferring monies into and out of trust accounts would not normally constitute practicing law for a non-lawyer and therefore it would not constitute practicing law for a suspended lawyer like Webster.

¶ 49.   However, in this case, Webster's transactions involved his IOLTA trust account. We believe IOLTA accounts are *sui generis* in that only attorneys who are required to participate in the program may have an IOLTA account. *See* SCR 20:1.15 and SCR 13.04.[8]

---

[8] SCR 20:1.15 provides, in pertinent part: "Safekeeping property. (a) A lawyer shall hold in trust, separate from the

¶ 50. Nonetheless, we find it unnecessary in this case to determine whether Webster's repeated deposits into and disbursals from his IOLTA trust account during his period of suspension constituted practicing law within the proscription in SCR 22.26(2) because Webster has in any event, not met the heavy burden placed on him by SCR 22.31 to obtain reinstatement. The referee's findings, which are not clearly erroneous, detailing Webster's activities during his suspension compel the conclusion that he has not met his burden to convince this court to grant his reinstatement petition.

¶ 51. When Webster filed his petition for reinstatement he submitted the required $200 advance deposit for costs of the reinstatement proceedings. *See* SCR 22.29(5). The OLR has now filed a Statement of Costs seeking a total of $9121.75 in costs beyond that $200 advance payment ($7224.10 for the costs incurred in the proceedings before the referee and an additional $1897.65 for costs incurred on this appeal). Webster has objected to OLR's request asserting that SCR 22.24 does not specifically provide for costs in reinstatement proceedings; in addition he claims that the imposition of costs in this matter would result in hardship and injustice to him.

---

lawyer's own property, that property of clients and third-persons that is in the lawyer's possession in connection with a representation or when acting in a fiduciary capacity . . . ."

SCR chapter 13 establishes the "Interest on Trust Accounts Program" (IOLTA) for lawyers. SCR 13.04 provides, in pertinent part: "Attorney participation in the program. (1) An attorney shall participate in the program as provided in SCR 20:1.15 . . . ."

347

¶ 52. Recently in *In re Disciplinary Proceedings Against Penn,* 2002 WI 5, 249 Wis. 2d 667, 638 N.W.2d 287, this court rejected the argument that there is no specific provision in SCR chapter 22 authorizing the imposition of costs in a reinstatement proceeding. In *Penn* we pointed out that SCR 22.29(5), as well as the general provision set out for disciplinary proceedings in SCR 22.11 through SCR 22.24, permit the imposition of costs against a petitioner in a reinstatement proceeding. Despite Webster's claim of inability to pay, under the circumstances of this case including the fact that during his suspension Webster collected significant fees for his representation of the trust in the foreclosure actions, we find it appropriate that Webster pay the full costs (with credit for his $200 advance deposit) of these reinstatement proceedings. *See In re Disciplinary Proceedings Against Eisenberg,* 122 Wis. 2d 627, 632, 363 N.W.2d 430 (1985).

¶ 53. IT IS ORDERED the petition of Leslie J. Webster seeking reinstatement of his license to practice law in this state is denied.

¶ 54. IT IS FURTHER ORDERED that within nine months of the date of this order, Leslie J. Webster pay to the Office of Lawyer Regulation the costs of this proceeding totaling $9121.75. If the costs are not paid within the time specified and absent a showing to this court of his inability to pay the costs within that time, the license of Leslie J. Webster to practice law in Wisconsin shall remain suspended until further order of the court.

¶ 55. IT IS FURTHER ORDERED that pursuant to SCR 22.33(4)[9] Leslie J. Webster may again file a

[9] SCR 22.33(4) [formerly SCR 22.28(8)] provides that "(4) If the supreme court denies a petition for reinstatement, the

petition for reinstatement nine months after the date of this order denying his petition for reinstatement.

¶ 56.   JON P. WILCOX, J., did not participate.

¶ 57. DAVID T. PROSSER, J. *(dissenting)*.   Part of the mission of this court is to protect the public from unethical attorneys. We owe no sympathy to attorneys who steal or otherwise betray their clients. These bad apples hurt people who have every right to trust them, and they reflect adversely on the integrity and standing of the bar. I take very seriously this court's duty to promote high ethical standards in the legal profession.

¶ 58.   If I thought this case involved injury to the public or the legal profession, I would eagerly join the court's opinion. However, I see the case differently. Never have the molehills of unauthorized practice been elevated to such heights.

¶ 59.   Attorney Webster's license to practice law in Wisconsin was suspended for two years beginning January 21, 1998. Now, almost four-and-a-half years after the onset of his suspension, Webster is denied reinstatement. He is demonized in the court's opinion and assessed the whopping sum of $9121.75 in costs.

¶ 60.   A careful reading of the court's opinion will reveal the emergence of some potentially troublesome principles of law. The court is largely concerned with Webster's unauthorized practice of law while he was under suspension. It points indignantly to the use of some old office checks carrying the name "Oltman & Webster, Ltd., Attorneys at Law" to pay salaries and other bills during Webster's suspension, as well as the purchase of an ad in the local telephone book in

petitioner may again file a petition for reinstatement commencing nine months after the denial."

349

anticipation of Webster's reinstatement. The referee relied on these peccadilloes as examples of Webster's unauthorized practice. The court writes cautiously that "these actions might not constitute practicing law," majority op. at ¶ 31, yet it condemns them as unethical. What is the court saying? In the wake of these pronouncements, what rights do partners in a small law firm have when another partner is suspended? Do they have to remove the partner's name from the firm during the partner's period of suspension? Are they forbidden to advertise the name of a firm that includes the name of a suspended partner?

¶ 61. A comparison of the court's opinion with the material in the record will show that a lot of information favorable to Attorney Webster has been left out. A lot of information that puts his errors in context has been left out. For instance, during his suspension, Webster appeared in four foreclosure actions in behalf of members of his family, always in a capacity other than attorney. Three of these cases are correctly denominated as the unauthorized practice of law based on the *Life Science* decision. *Life Science Church v. Shawano Co.*, 221 Wis. 2d 331, 585 N.W.2d 625 (Ct. App. 1998). One case involving his children is disregarded as being different. It happens to be the one case commenced before the decision in the *Life Science* case.

¶ 62. More than two years ago, 13 members of the District 5 Professional Responsibility Committee (Committee) met in La Crosse to review Webster's application for reinstatement. Certain problems were identified. The Committee followed up with a careful investigation and issued a 19–page report. Ultimately, the Committee found that, in several respects, Webster "technically engaged in the unauthorized practice of law during the term of his suspension . . . . He did not

intentionally violate the terms of his suspension and merely appeared as trustee on behalf of a family trust without knowledge of the *Life Science* decision."

¶ 63.   The Committee's recommendation states in part:

> Based on the conclusion that Mr. Webster was engaged in the practice of law, he has not demonstrated by clear and convincing evidence full compliance with the terms of the suspension order and the requirements of SCR 22.26. Therefore, the Committee cannot recommend reinstatement under the standard of SCR 22.28(6). However, like *Petition of Eisenberg,* the recommendation for denial of reinstatement should be modified on the grounds that the denial may work an unjustifiably harsh result.

> The Committee is satisfied that Mr. Webster has the moral character to practice law within the standards expected of the bar and the administration of justice. . . .

> Mr. Webster has paid what the Committee considers to be a most serious penalty for his misconduct, in light of suspensions ordered for misconduct in other cases. As of the present time he has been suspended from the practice of law for 30 months. He will remain suspended until the Board makes it[s] recommendations to the Supreme Court, and the Supreme Court ultimately decides the matter. By that time Mr. Webster's suspension could approach or exceed three years and if his petition is denied, he will be precluded from again filing a petition for reinstatement for at least nine months following the denial. See, SCR 22.28(8).

> In *Petition of Eisenberg,* the referee felt compelled to recommend a denial of reinstatement because of the petitioner's unauthorized practice of law. However he recommended that the denial might work [an] "unjus-

351

tifiably harsh" result by extending the term of the suspension for an inordinate period. The Supreme Court stated:

> Eisenberg's failure to ascertain beforehand the legal effect of an appearance before the hearing examiner does not excuse his conduct. We feel, however, that a denial of reinstatement of his license to practice law . . . would be too severe.

The Committee recommends that the Board and Supreme Court adopt a similar rational[e] in this case. . . . The Board and the court should consider the harshness of this sanction in concluding that the Petition for Reinstatement should be granted.

¶ 64.   I agree with the recommendation of the District 5 Professional Responsibility Committee. In deference to the Committee's judgment, I respectfully dissent.