IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Marvin E. MARKS, Attorney at Law:

OFFICE OF LAWYER REGULATION, Complainant-
Respondent-Cross-Appellant,

v.

Marvin E. MARKS, Respondent-Appellant-Cross-
Respondent.

Supreme Court

*No. 01–2284–D. Oral argument January 23, 2003.—Decided
July 16, 2003.*

2003 WI 114

(Also reported in 665 N.W.2d 836.)

For the respondent-appellant-cross respondent there were briefs by *Daniel W. Hildebrand* and *DeWitt Ross & Stevens, S.C.,* Madison, and oral argument by *Daniel W. Hildebrand.*

For the complainant-respondent-cross appellant there were briefs by *Richard P. Mozinski* and *Radosevich, Mozinski, Cashman & Olson, LLP,* Manitowoc, and oral argument by *Richard P. Mozinski.*

¶ 1. PER CURIAM. Attorney Marvin E. Marks appeals from the recommendation of the referee that his license to practice law in Wisconsin be suspended for 60 days for having asserted he maintained a lien on settlement proceeds in violation of SCR 20:8.4(c).[1] The Office of Lawyer Regulation (OLR) cross-appeals from the referee's decision to dismiss two claims that were filed against Attorney Marks under the Michigan Rules of Professional Conduct.

¶ 2. We determine that a 60–day suspension is appropriate discipline under the facts of this case. We further conclude that the referee erred by dismissing the Michigan disciplinary counts. However, we are of the opinion that remanding this matter would not serve the interests of judicial efficiency. The OLR has indicated that its recommendation with respect to discipline would not change, even if violations of the Michigan rules of disciplinary conduct were established, and there has already been substantial delay in the prosecution of this matter.

---

[1] SCR 20:8.4(c) provides: "It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

3

¶ 3.　Attorney Marks was admitted to practice in Wisconsin in 1983. He is also a member of the Michigan State Bar. Approximately 75 percent of his practice is based in Michigan and he maintains his office in Michigan.

¶ 4.　In 1992 Marks was issued a private reprimand for violating SCR 20:3.1(a)(1), for commencing an action that was unwarranted under existing law. In June 1994 he received a public reprimand for violating SCR 20:3.4(c), because he failed to pay a $10,000 judgment entered against him in connection with filing the aforementioned frivolous action. In July 1999, while this matter was pending, Marks received another private reprimand for conduct constituting a conflict of interest in violation of SCR 20:1.7(b) and SCR 20:1.9(a).

¶ 5.　The facts of this matter are largely undisputed. On October 18, 1996, Donald Koivisto (Mr. Koivisto) retained Marks to represent him in a personal injury action. Mr. Koivisto's wife had just been killed in an automobile accident in Iron County, Wisconsin. His daughter and granddaughter were injured in the accident. The driver of the other vehicle was a Michigan resident.

¶ 6.　Mr. Koivisto signed a Percentage Fee Agreement (Fee Agreement) that provided for a contingency fee of 25 percent of the amount recovered unless the matter went to trial, in which case the fee would be 33 and 1/3 percent. Marks explained the fee options and Mr. Koivisto elected a contingency fee arrangement rather than an hourly fee. On October 24, 1996, Mr. Koivisto's daughter signed a similar Fee Agreement on behalf of her minor daughter. Paragraph 5 of both Fee Agreements provided as follows:

> If for any reason, the Attorney-Client relationship was
> to be terminated prior to settlement, compromise, or

judgment, etc., without good cause on client's behalf, the client hereby agrees to pay attorney for the value of legal services received by the client for attorney on an hourly rate schedule of $100.00 per hour plus expenses. Said fee will be immediately due and payable.

¶ 7. It is undisputed that Marks diligently pursued his clients' cases from October 18 through October 25. He drafted letters, contacted insurers, contacted the district attorney's office and the sheriff's department, met with his clients, and began to prepare pleadings. Mr. Koivisto acknowledges that Marks was diligently pursuing the matter.

¶ 8. However, on October 25, 1996, Mr. Koivisto contacted Attorney Michael Fauerbach and asked Fauerbach to represent him instead. Mr. Koivisto signed a Fee Agreement with Fauerbach, providing for a contingency fee of 30 percent. With Fauerbach present, Mr. Koivisto then called Marks to tell him he was transferring the case to Fauerbach.

¶ 9. A series of phone calls ensued. Marks asked why Mr. Koivisto was transferring the case and Mr. Koivisto explained that Fauerbach's law firm had more lawyers and an investigator. Fauerbach denies that he solicited the case or that he advised Mr. Koivisto how to respond to Marks' questions.

¶ 10. The same day Marks wrote to Fauerbach, via facsimile, expressing surprise at the transfer of the case and stating that he did not think Fauerbach's law firm could move the case along more quickly.

¶ 11. The next day Marks wrote directly to Mr. Koivisto, expressing surprise, outlining the work he had performed to date, and stating that he hoped to continue working with Mr. Koivisto. He also retained Attorney Roy Polich to represent him because he be-

lieved Fauerbach had improperly and intentionally interfered with the Fee Agreement between Mr. Koivisto and himself.

¶ 12. On October 28 Fauerbach responded to Marks via facsimile. Fauerbach denied soliciting the case and denied making negative comments about Marks or Marks' law firm. He asked Marks to send him the Koivisto file, as well as an itemized statement of the time spent on it.

¶ 13. The same day Attorney Polich wrote to Fauerbach on Marks' behalf, stating that Marks believed Fauerbach had acted unethically and had intentionally interfered with Marks' contract with Mr. Koivisto.

¶ 14. Fauerbach responded to Attorney Polich denying the allegations and attaching an affidavit executed by Mr. Koivisto that averred that the Fauerbach firm had not provided him with the reasons he thought Fauerbach's firm would do a better job on the case. That same day Mr. Koivisto's daughter terminated Marks' representation and transferred her daughter's matter to Fauerbach. She signed a contingency Fee Agreement with Fauerbach on or about November 1, 1996.

¶ 15. On October 31, 1996, Marks submitted an invoice to Mr. Koivisto for $1812.24, detailing the work performed on the matter and stating that the bill was due November 15, 1996. The same day, Matt Zielke, of Frankenmuth Insurance, wrote to Marks explaining that he understood that Fauerbach was now representing the Koivistos. Zielke asked Marks to advise him, in writing, if Marks maintained a lien on any settlement of the Koivisto claims.

¶ 16. On November 6, 1996, Carol Coursey of American National Property & Casualty Company wrote to Marks stating that she understood that Fauer-

bach was now representing the Koivistos and asking for a letter of withdrawal so she could review it to determine whether Marks had any liens on the settlement of the Koivisto claims.

¶ 17. About this time Fauerbach wrote to Marks requesting Mr. Koivisto's file "for the fourth time" and advising Marks that he was now representing Mr. Koivisto's daughter. This was the first written notice Fauerbach sent regarding this representation. Mr. Koivisto's daughter testified she did not contact Marks personally to tell him she was transferring the case to Fauerbach. In the same letter, Fauerbach advised Marks that Mr. Koivisto had consulted Fauerbach about Marks' invoice, and stated that it was difficult to render advice with respect to the bill without having seen the materials generated in the file.

¶ 18. On November 6, 1996, Marks advised Fauerbach that he required signed releases from Mr. Koivisto and his daughter before he would release the files, as they contained confidential client information. He also indicated that he had not been advised how his lien for his attorney fees would be protected.

¶ 19. The same day Fauerbach sent Marks a facsimile, requesting that Marks deliver the Koivisto files to Fauerbach's office in Ironwood, Wisconsin. He suggested that Marks would be paid from the proceeds of the case and confirmed that he had told Mr. Koivisto he would reduce his 30 percent contingency fee by the amount of Marks' charges.

¶ 20. On November 11 Fauerbach sent, via facsimile, the signed releases, stating that "[b]efore any final decision is made regarding your fees we would like to see the file materials that have been generated." Marks interpreted this letter as questioning his fees

7

and thus as contrary to the Fee Agreement, which required immediate payment.

¶ 21. The same day Marks wrote to Fauerbach, indicating that he had sent the Koivisto files. He also stated that he would be suing the Fauerbach firm for interference with contract. Fauerbach subsequently acknowledged receipt of the files.

¶ 22. On November 14 Marks wrote letters to the two insurance adjusters, Zielke and Coursey, stating that his office "maintains a lien on each of your files out of the settlement of the claims in the amount of 25%." The letter enclosed copies of the Fee Agreements signed by the Koivistos.

¶ 23. On November 19 Fauerbach advised Marks that Mr. Koivisto would pay the $1812.24 legal bill, provided Marks agreed to sign a release with respect to the Koivisto matters, and agreed to drop any claimed "lien" related to these matters. Marks refused to sign the release, later explaining that the Fee Agreement did not require Marks to sign any release to be entitled to payment of his legal fees.

¶ 24. On November 21 Marks wrote to Coursey, advising her that his office maintained a lien on the proceeds of 25 percent of any recovery in the Koivisto matters. As of that date his bill for legal services had not been paid.

¶ 25. On December 2 Fauerbach filed a motion in Iron County Circuit Court in Wisconsin for an order determining that Marks was not entitled to any legal fees other than those set forth in the previously submitted invoice (the "Wisconsin action").

¶ 26. On December 11 Marks filed suit against Fauerbach, the Koivistos, and the insurers in Gogebic County Circuit Court, Michigan, alleging interference with contract and asserting a "charging lien" (the "Michigan action").

¶ 27. On December 12 there was a court hearing in the Wisconsin action. The trial court concluded that Marks was entitled to recover his fees in the amount of $1812.24. The court therefore directed Marks to endorse two settlement checks that had been received from the insurers, each in the amount of $1000. Marks endorsed the checks on December 18 as follows: "Signed as Per Court Order of 12/12/96, with exception."

¶ 28. On December 20 Marks sent a second invoice to Mr. Koivisto, billing him for an additional $420.37 in legal fees and stating that these additional fees were due December 31. The total amount of the legal fees claimed by Marks now totaled $2232.61.

¶ 29. On January 6, 1997, Marks received a check in the amount of $1812.24 from the Iron County Registrar as payment for his legal fees. The funds were derived from the two settlement checks that Marks had endorsed at the court's direction. Marks returned the check indicating he believed accepting it would constitute a release of his claims against Fauerbach.

¶ 30. On March 26 the insurance adjuster, Zielke, wrote to Fauerbach, advising him that Frankenmuth Insurance would settle the Koivisto claims for its policy limit of $100,000, in exchange for a release. Because Marks had refused to accept the check for his legal fees, Fauerbach obtained a court order directing Marks to endorse the anticipated settlement check if his name was identified as a payee.

¶ 31. On April 21 Fauerbach contacted Zielke and told him that the settlement check should be issued

without Marks' name on it. Zielke responded that if he were to issue the settlement check without Marks' name on it, he would require an unlimited indemnification from Fauerbach. Fauerbach was unwilling to offer unlimited indemnification and told Zielke to simply issue the settlement check with Marks' name on it.

¶ 32. Upon receipt of the settlement check, Fauerbach asked Marks to endorse it. Marks refused.

¶ 33. Meanwhile, on April 8 Marks filed a brief in the Michigan action, opposing Fauerbach's motion to dismiss the Michigan claim and arguing that he was legally entitled to maintain a lien on the Koivisto settlement.

¶ 34. On April 28 Marks amended his complaint in the Michigan action to add a slander claim against Fauerbach. He did not amend that portion of the complaint that stated that his legal fees had not been paid.

¶ 35. On June 9 Marks' lawyer advised the Koivistos that Marks would settle the lien claim and endorse the settlement check, *provided* that only the Koivistos (and not Fauerbach) received the settlement monies. Mr. Koivisto expressed frustration that he had been forced to pay approximately $1200 in legal fees in connection with defending against the Michigan action. Marks agreed to reduce his legal bill of $2232.61 by $1200, to reflect the fees paid by Mr. Koivisto in connection with the Michigan action. Marks also agreed to dismiss the insurers and the Koivistos from the Michigan action, and further agreed to limit his claim against Fauerbach to $25,000.

¶ 36. This settlement agreement was formalized and signed on June 20, 1997. On July 11 the Michigan court signed the related order and Marks endorsed the $100,000 settlement check without further delay.

¶ 37. On July 18 Fauerbach sent a check for $75,000 to Mr. Koivisto. Fauerbach also directed the Iron County Wisconsin Registrar to return the $1812 check (previously refused by Marks) to Mr. Koivisto.

¶ 38. In January 1998 the parties stipulated to dismissal of all claims in the Michigan action, including Marks' appeal from an order granting summary judgment against him. The Fauerbach firm received the $25,000 fee, previously held in an escrow account.

¶ 39. On October 9, 1998, Mr. Koivisto and Fauerbach filed a grievance with OLR against Marks. Nearly three years later, on August 29, 2001, the OLR filed a complaint against Marks alleging three counts:

(1) Marks violated SCR 20:8.4(c), or, in the alternative, Michigan Rule of Professional Conduct (MRPC) 8.4(b) by issuing correspondence to two insurers in November 1996, claiming a lien on 25% of the proceeds of the wrongful death and personal injury claims asserted by the Koivisto family (Count 1);

(2) Marks violated MRPC 3.1 by filing a complaint and amended complaint in Michigan Circuit Court asserting a breach of contract claim after the Koivistos terminated Marks' representation (Count 2);

(3) Marks violated MRPC 8.4(b) by filing an amended complaint alleging in the Michigan lawsuit that Donald had not paid Marks' billing statement when the amount had been tendered (Count 3).

¶ 40. Marks answered, denying the charges. He subsequently moved to dismiss the complaint on the grounds it alleged violations of Michigan disciplinary rules or, in the alternative, sought a stay of the proceed-

11

ings to permit the OLR to refer the matter to the Michigan disciplinary authority. The OLR opposed the motion.

¶ 41. Following briefing and oral argument the referee granted Marks' motion to dismiss the complaint as to Count 1 (the Michigan alternative), Count 2, and Count 3, each of which alleged violations of the Michigan disciplinary rules. Subsequently, Marks filed a motion in limine to suppress evidence that he violated the Michigan rules. The referee granted the motion but permitted the OLR to introduce evidence that Marks alleged the existence of a "charging lien" in the Michigan action.

¶ 42. The trial on the remaining count, the alleged violation of SCR 20:8.4(c), occurred on June 3, 2002. The referee issued a report and recommendation on June 27, 2002, concluding that Marks violated SCR 20:8.4(c), and recommending a 60–day suspension. Both parties now appeal.

¶ 43. The parties agree that the referee's findings of fact will be upheld unless they are clearly erroneous and that the referee's conclusions of law are to be reviewed de novo. *In re Disciplinary Proceedings Against Swartwout*, 116 Wis. 2d 380, 342 N.W.2d 406 (1984).

■

¶ 44. The first issue presented for review is whether Marks violated SCR 20:8.4(c) by notifying two insurance companies that he maintained a lien on the proceeds for 25 percent of his former client's recovery in a personal injury wrongful death claim.

¶ 45. First, the referee was required to decide whether Michigan or Wisconsin rules should apply to this claim, as it was pled by OLR in the alternative. The

referee determined that the predominant effect of Marks' alleged misconduct occurred in Wisconsin because it affected the Koivistos, who are Wisconsin residents. The referee thus concluded that Wisconsin law applied to this claim. Neither party appears to dispute that the Wisconsin disciplinary rule was properly applied to this count.

¶ 46. Turning to the substantive question presented, the referee made certain findings of fact, then made the following conclusions of law:

1. The Koivistos had the right to discharge respondent as their attorney in connection with their wrongful death and personal injury claims;

2. Respondent's lien claim was wrongful because the fee agreement was not in existence in November 1996 when he wrote the two insurance companies involved nor was it in existence in December 1996 or April 1997 when he asserted his lien claims in the Michigan action. *McBride v. Wausau Insurance Companies*, 176 Wis. 2d 382, 500 N.W.2d 387 (Ct. App. 1993).

3. Respondent's insistence on claiming a lien impaired Attorney Fauerbach's representation of the Koivistos and delayed payment of the proceeds he ultimately recovered for the Koivistos;

4. Respondent was guilty of misrepresentation in stating he held a lien against the two insurance companies involved in this matter in his letters to them on November 14, 1996 and November 21, 1996.

5. Respondent violated SCR 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation when he wrote letters to the

two insurance companies in November 1996 stating that he held a lien against them and the Koivistos on any settlement proceeds the Koivistos might receive in settlement of their claims.

¶ 47. Marks disputes the referee's conclusion that he violated SCR 20:8.4(c) when he wrote the two insurers to advise them that he maintained a 25 percent lien on the proceeds of the Koivisto settlements. Essentially, Marks contends that he may have been wrong about having such a lien, but that he did not intentionally deceive anyone because he believed he was legally justified in asserting the lien claims.

¶ 48. We cannot agree. The circumstances of this case support the referee's conclusion that Marks violated SCR 20:8.4(c) when he wrote letters to the two insurance companies in November 1996 stating that he held a lien against any proceeds the Koivistos might receive in settlement of their claims.

¶ 49. At argument the question was raised whether the findings of fact made by the referee support the conclusion that Marks' engaged in misrepresentation in violation of SCR 20:8.4(c). Counsel for Marks correctly asserts that this court will not make a finding that the referee could have made but did not. *See In re Disciplinary Proceedings Against Wood*, 122 Wis. 2d 610, 363 N.W.2d 220 (1985); *see also Disciplinary Proceedings Against Swartwout*, 116 Wis. 2d 380, 342 N.W.2d 406 (1984) (court will not conduct de novo review of record or independently make factual findings).

¶ 50. Our review would be simpler had the referee made more explicit findings to support his conclusion that Marks' conduct constituted misrepresentation in violation of SCR 20:8.4(c). However, it is unnecessary to either plead or prove the tort of misrepresentation in

14

order to establish by clear and convincing evidence that an attorney has violated a rule of professional conduct, proscribing attorney conduct involving dishonesty, fraud, deceit or misrepresentation. *In re Disciplinary Proceedings Against Schalow,* 131 Wis. 2d 1, 13, 388 N.W.2d 176 (1986).

¶ 51. We conclude that the referee's findings do support the conclusion that Marks' conduct constituted misrepresentation in violation of SCR 20:8.4(c). The referee found that the Koivistos executed the Fee Agreement, that they opted to terminate Marks' representation, that Marks submitted an invoice for the legal fees and expenses incurred during the period of his representation, and that subsequently, Marks represented to two insurance companies that he maintained a 25 percent lien on any settlement ultimately obtained by the Koivistos. Marks did not release that lien claim until more than a year later, in June 1997. The circumstances as reflected in the referee's findings establish that Marks' conduct rose to the level of misrepresentation in violation of SCR 20:8.4(c).

¶ 52. While Marks may have legitimately maintained a claim for the legal services he rendered before the date of his termination, he nonetheless represented to the insurers that he was entitled to fully 25 percent of any recovery ultimately obtained by the Koivistos. Such a representation is simply contrary to the express terms of the Fee Agreement. Paragraph One of the Fee Agreement provided that the Koivistos would pay Marks "25 percent of the total value of the property (settlement, compromise, or judgment) recovered for the client by the Attorney." Paragraphs Two and Three described various costs and expenses for which the client would be responsible. Paragraph Four provided

15

that the client would "render to the attorney, an attorney's lien on the proceeds of any settlement, . . . ."

¶ 53. However, an entirely separate provision of the Fee Agreement sets forth the procedure for compensating Attorney Marks in the event the lawyer-client relationship was terminated. Paragraph Five provides:

> If for any reason, the Attorney-Client relationship was to be terminated prior to settlement, compromise or judgment, etc., without good cause on client's behalf, the client hereby agrees to pay attorney for the value of legal services received by the client for attorney on an hourly rate schedule of $100.00 per hour plus expenses. Said fee will be immediately due and payable.

¶ 54. This is the provision applicable to Marks' claim for legal fees. As the OLR correctly asserts: "Marks knew . . . when he wrote his letters of November 14, 1996 and November 21, 1996 . . . that any fee due him by the Koivistos was not to be calculated on a contingency fee basis."[2]

[2] The referee cited *McBride v. Wausau Ins. Co.,* 176 Wis. 2d 382, 500 N.W.2d 387 (Ct. App. 1993) in support of his conclusion of law that the claim was wrongful. Marks asserts that the referee's reliance on *McBride* is misplaced. We agree that *McBride* is distinguishable. In *McBride* the court held that an attorney who was discharged by her client prior to obtaining a settlement was not entitled to recover any portion of the legal fees pursuant to the contingency agreement because she provided such substandard legal services that she effectively breached the fee agreement with her former client. By contrast, there is no dispute that Marks pursued the Koivisto cases diligently during the brief period of his representation, and that he was entitled to recover the fees and costs incurred during that representation. However, the fact that *McBride* is inapposite does not alter the referee's conclusion that Marks engaged

¶ 55. We thus agree with the referee's conclusion that Marks' letters to the insurers stating that he "maintains a lien on each of your files out of the settlement of the claims in the amount of 25%" constituted misrepresentation in violation of SCR 20:8.4(c).

¶ 56. Next, Marks asserts that the 60–day suspension recommended by the referee is excessive. He suggests that a public reprimand is more appropriate discipline for a violation of SCR 20:8.4(c) based on the facts set forth herein.

¶ 57. Marks has been reprimanded on three prior occasions. Further, as the referee found, Marks' actions delayed Mr. Koivisto's receipt of the settlement. We are not persuaded that this finding is clearly erroneous. We agree with the referee that a 60–day suspension of Marks' license to practice law is appropriate discipline under the circumstances of this case.

¶ 58. We turn to the issue presented by the OLR on cross-appeal: namely, whether the referee erred in dismissing two counts from the disciplinary complaint that alleged violations of the Michigan Rules of Professional Conduct.

¶ 59. The OLR alleged that Marks violated MRPC 3.1 and MRPC 8.4(b). These counts relate to the lawsuit Marks filed in Michigan against the Koivistos, Attorney Fauerbach and the insurers.

¶ 60. This cross-appeal presents a choice of law question and requires the court to interpret SCR 20:8.5, which provides:

---

in misrepresentation when he wrote the letters to the insurers representing he was entitled to a 25 percent lien on the Koivisto settlement proceeds.

SCR 20:8.5. Disciplinary authority; choice of law.

(a) Disciplinary Authority. A lawyer admitted to the bar of this state is subject to the disciplinary authority of this state regardless of where the lawyer's conduct occurs. A lawyer allowed by a court of this state to appear and participate in a proceeding in that court is subject to the disciplinary authority of this state for conduct that occurs in connection with that proceeding. For the same conduct, a lawyer may be subject to the disciplinary authority of both this state and another jurisdiction where the lawyer is admitted to the bar or allowed to appear in a court proceeding.

(b) Choice of Law. In the exercise of the disciplinary authority of this state, the rules of professional conduct to be applied shall be as follows:

(1) for conduct in connection with a proceeding in a court before which a lawyer has been authorized to appear, either by admission to the bar in the jurisdiction or by the court specifically for purposes of that proceeding, the rules to be applied shall be the rules of the jurisdiction in which the court sits, unless the rules of the court provide otherwise.

(2) for any other conduct,

(i) if the lawyer is admitted to the bar of only this state, the rules to be applied shall be the rules of this state.

(ii) if the lawyer is admitted to the bars of this state and another jurisdiction, the rules to be applied shall be the rules of the admitting jurisdiction in which the lawyer principally practices, except that if particular conduct clearly has its predominant effect in another jurisdiction in which the lawyer is admitted to the bar, the rules of that jurisdiction shall be applied to that conduct.

18

¶ 61. After briefing and oral argument the referee granted Marks' motion to dismiss these two counts and subsequently granted a motion in limine, precluding the OLR from introducing evidence about the alleged Michigan rule violations at trial.

¶ 62. The referee expressed concern about the basis for the OLR's authority to enforce the disciplinary rules of another jurisdiction, as well as concern about possible inconsistencies between the laws and rules of Wisconsin and other states. Ultimately, the referee reasoned that the predominant effect of Marks' alleged misconduct occurred in Wisconsin because it affected the Koivistos, who are Wisconsin residents. The referee thus dismissed the Michigan counts, observing: "[t]he Comment to SCR 20:8.5 makes it clear that in a choice of law situation 'any particular conduct of a lawyer shall be subject to only one set of rules of professional conduct.' "

¶ 63. On appeal the OLR contends that the referee erred and that, under the facts presented, SCR 20:8.5 authorizes the OLR to apply Michigan disciplinary rules. This is an issue of first impression.

¶ 64. There is no dispute that because Marks is a member of the Wisconsin bar he is subject to the disciplinary authority of this state regardless where his alleged misconduct occurred. Marks, who is also a member of the Michigan bar, allegedly filed and litigated a frivolous lawsuit in the Michigan courts. This constituted "conduct in connection with a proceeding in a court before which a lawyer has been authorized to appear. . . . " SCR 20:8.5(a)(1). As such, SCR 20:8.5(a)(1) provides that "the rules to be applied *shall be the rules of the jurisdiction in which the court sits,* unless the rules of the court provide otherwise." *Id.* (emphasis

19

added). Therefore, we agree with the OLR that it was authorized to proceed under the Michigan disciplinary rules.

¶ 65. We find support for our conclusion in the American Bar Association (ABA) Model Rules of Professional Responsibility. ABA Model Rule 8.5 is identical to SCR 20:8.5. *See* Ronald D. Rotunda, *Professional Responsibility: A Student's Guide* (2001 ed.) at 731–32. Referring to ABA Model Rule 8.5(b), Professor Rotunda states:

> The goal of [Rule 8.5] is to insure that any particular conduct of a lawyer should be subject to only one set of rules. Both jurisdictions may impose discipline, but they should both be using the same set of rules against which they measure the conduct. Disciplinary authorities should avoid proceeding against a lawyer on the basis of two inconsistent rules. The choice of law issue is: which jurisdiction's ethics should apply to a lawyer admitted in more than one jurisdiction?

*Id.* at 735. In an example assuming misconduct by a lawyer admitted in state A but committed before a court in state B, Professor Rotunda concludes: "Under the Model Rules, if that lawyer then violates the rules of the court in state B, *state A should apply the ethics rules of state B,* which are the rules applicable to that case." *Id.* (emphasis added).

¶ 66. We thus hold that SCR 20:8.5 authorizes the OLR to proceed with a complaint alleging violations of the Michigan Rules of Professional Conduct for alleged misconduct that occurred in a proceeding before a court in the state of Michigan.

¶ 67. Marks, however, suggests that the better practice would be for the OLR to refer this matter to the Michigan disciplinary authorities. He notes that if the Michigan Supreme Court disciplined Marks, this court

could then impose reciprocal discipline under SCR 22.22. He contends this would be a more efficient procedure, because Wisconsin disciplinary authorities would not be required to construe the rules and possibly the substantive law of another state.

¶ 68. Even if we agree that may be the better practice, SCR 20:8.5 does authorize the OLR to proceed with a complaint alleging violations of the Michigan Rules of Professional Conduct for alleged misconduct that occurred in a proceeding before a court in the State of Michigan. Therefore, the referee erred by dismissing counts two and three of the OLR complaint.

■

¶ 69. However, we are of the opinion that remanding this matter would not advance judicial efficiency. The OLR has indicated that its recommendation with respect to discipline would not change, even if violations of the Michigan Rules of Disciplinary Conduct were established, and there has already been substantial delay in the prosecution of this matter.[3]

¶ 70. Finally, we accept the referee's recommendation that Attorney Marks be required to pay the costs of this disciplinary proceeding.

¶ 71. Upon the foregoing reasons,

¶ 72. IT IS ORDERED that the license of Marvin E. Marks to practice law in Wisconsin is suspended for a period of 60 days, effective August 20, 2003.

¶ 73. IT IS FURTHER ORDERED that Marvin E. Marks comply with the provisions of SCR 22.26 con-

---

[3] Consistent with that determination we decline to stay this matter pursuant to Wis. Stat. § 801.63, nor will we require the OLR to refer the matter to the Michigan disciplinary authorities.

cerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶ 74. IT IS FURTHER ORDERED that within 60 days of the date of this order Attorney Marvin E. Marks shall pay to the Office of Lawyer Regulation the costs of this proceeding. If the costs are not paid within the time specified, and absent a showing to this court of his inability to pay the costs within that time, the license of Attorney Marvin E. Marks to practice law in Wisconsin shall be suspended until further order of the court.

¶ 75. WILLIAM A. BABLITCH, J., and JON P. WILCOX, J., did not participate.

¶ 76. DAVID T. PROSSER, J. *(dissenting).* This case raises disturbing issues about attorney discipline proceedings in Wisconsin. For the reasons stated herein, I respectfully dissent.

¶ 77. The court approves a referee's recommended discipline of Attorney Marvin E. Marks under Wisconsin SCR 20:8.4(c), for engaging in conduct that involved misrepresentation. The referee's Conclusions of Law state:

> 2. Respondent's lien claim was wrongful because the fee agreement [he had with the Koivisto family] was not in existence in November 1996 when he wrote the two insurance companies involved nor was it in existence in December 1996 or April 1997 when he asserted his lien claims in the Michigan [legal] action. *McBride v. Wausau Insurance Companies,* 176 Wis. 2d 382, 500 N.W.2d 387 Ct. App. 1993).

> . . . .

> 4. Respondent was guilty of misrepresentation in stating he held a lien against the two insurance companies involved in this matter in his letters to them on November 14, 1996 and November 21, 1996.

5. Respondent violated SCR 8.4(c) by engaging in conduct involving dishonesty, fraud, deceipt [sic] or misrepresentation when he wrote letters to the two insurance companies in November 1996 stating that he held a lien against them and the Koivistos on any settlement proceeds the Koivistos might receive in settlement of their claims.

¶ 78. First, the court acknowledges that the *McBride* case does not support the referee's legal conclusion. Per curiam op., ¶ 54, n.2.

¶ 79. Second, and more important, the referee made no factual finding that Attorney Marks knew or should have known that he was not justified in asserting a lien claim on November 14 and November 21, 1996.

¶ 80. The court's per curiam opinion, ¶ 47, summarizes the situation: "Essentially, Marks contends that he may have been wrong about having such a lien, but that he did not intentionally deceive anyone because he believed he was legally justified in asserting the lien claims." The per curiam never responds to this contention by asserting that Attorney Marks knew or should have known that he did not have a lien. It dances around this predicament in ¶ 51.

¶ 81. The court's treatment of the problem leads to one of two unpalatable results: either this court has engaged in implicit fact-finding, contrary to our own statements and precedent, or we have concluded that it is *not* necessary for an attorney to know or have reason to know that something he represents is not correct, in order for us to find the attorney guilty of misrepresentation.

¶ 82. Attorney Marks' purported "misrepresentation" needs to be put in context. There is no dispute that Donald Koivisto entered into a Contingent Fee Agree-

ment with Attorney Marks in connection with Mrs. Koivisto's untimely and wrongful death. That agreement was signed on October 22, 1996. Koivisto's daughter, Nikki, entered into a similar agreement on October 24, 1996. Both agreements contained the following paragraph:

> 5. If for any reason, the Attorney-Client relationship was to be terminated prior to settlement, compromise, or judgment, etc., without good cause on client's behalf, the client hereby agrees to pay attorney for the value of legal services received by the client for attorney on an hourly rate schedule of $100.00 per hour plus expenses. Said fee will be immediately due and payable.

¶ 83. The referee based his conclusion about Marks' misrepresentation on the premise that "the fee agreement was not in existence in November 1996 when he wrote the two insurance companies." There is no dispute, however, that the hourly rate billed on October 31, 1996, had not been paid on November 14, 1996, when Marks wrote the first letter. On November 11 the Koivistos' new attorney had proposed paying Attorney Marks "after settlement of the Anna Koivisto wrongful death case."

¶ 84. The new attorney also indicated that before any final decision regarding payment of Marks' fees would be made, the attorney wished to see the file materials that had been generated by Marks. In other words, the attorney who acquired the Koivisto case from Marks reserved the right to delay payment of Marks' legal fees and to evaluate Marks' legal work before Marks was paid. These conditions were not part of the two Contingent Fee Agreements, and when Marks was not paid by November 15, he reasonably concluded that the agreements had been breached.

24

¶ 85. Rightly or wrongly, Marks thought the Koivistos' new attorney had tampered with his contract. He retained a lawyer to represent him in the matter. On November 11 Marks advised the Koivistos' new attorney that he would sue the attorney's firm for interference with contract. All this preceded the November 14 letter.

¶ 86. Prior to the November 21 letter, the new attorney advised Marks that Koivisto would pay Marks' legal bill *if* Marks agreed to sign a release and drop any claimed lien. The per curiam opinion does not explain what effect this release would have had on Marks' tampering claim. Ultimately, Marks filed suit in Michigan alleging an interference with contract and claiming a "charging lien."

¶ 87. The sum of all this is that Attorney Marks could have believed that he had a lien when he wrote letters to the two insurance companies. Even now in this appeal, Marks' attorney maintains that Marks had a legitimate basis for claiming such a lien.

¶ 88. The per curiam opinion does not decimate this argument, nor does it assert that Marks knew or should have known that he did not have a lien *at the time of the November letters,* the critical period for this case. Consequently, I do not understand what rule of law on misrepresentation comes out of this case.

¶ 89. Over time Marks became obsessed with pursuing a lost cause. He went too far. I would have no problem issuing a public reprimand on an appropriate charge. But Marks' license to practice law is suspended for two months for conduct involving misrepresentation *in November 1996,* in violation of SCR 20:8.4(c), which is a charge that was not satisfactorily proved.

¶ 90. Beyond the suspension, this court imposes costs of $22,178.69. These costs are disproportionate to

the seriousness of the offense. In part, they reflect OLR's obsession to appeal an issue that it lost before the referee. The issue of costs in attorney discipline cases requires prompt attention, for excessive costs will deter some attorneys from adequately defending themselves and may prevent others from ever returning to the practice of law.