In the Matter of Disciplinary Proceedings Against
Chris K. Konnor, Attorney at Law:

Office of Lawyer Regulation, Complainant,

v.

Chris K. Konnor, Respondent.

Supreme Court

*No. 03–1181–D. Decided March 25, 2005.*

2005 WI 37

(Also reported in 694 N.W.2d 376.)

¶ 1. PER CURIAM. We review the referee's report and recommendation that Attorney Chris K. Konnor be publicly reprimanded for having committed eight counts of professional misconduct as alleged in the complaint filed by the Office of Lawyer Regulation (OLR) in this court on May 1, 2003. In general, the referee determined that Konnor had seriously neglected a probate matter, had failed to keep the beneficiaries advised of the status of the matter, had not appropriately handled the estate assets because he had not deposited them in accounts bearing interest, had not made timely deposits, and had not attempted to collect rents on the estate property.

¶ 2. Rejecting the OLR's position that Konnor's license should be suspended for 90 days as a sanction for these eight separate counts of misconduct, the referee recommended a public reprimand and that Konnor be ordered to pay the costs of this proceeding totaling $11,365.06.

¶ 3. Neither party has appealed from the referee's report and recommendation for public reprimand. Konnor has, however, filed an objection in this court to the costs as requested by OLR. Konnor seeks a reduction or amelioration of the total costs because he claims that several times prior to the hearing before the referee, he and/or his attorney expressed willingness to resolve the matter by a stipulated private or public reprimand; the OLR, however, declined to accept those offers and instead chose to pursue a 90–day license suspension as a sanction. Konnor maintains that as a matter of equity and reasonableness, this court should view his offers to accept a public reprimand for his misconduct as a reason to now mitigate the costs as requested by OLR—especially those costs which were incurred because of the hearing before the referee. Konnor is willing to pay $6774.91 in costs incurred prior to the referee's hearing, but now asks to be absolved from paying the additional $4590.15 in costs that were incurred as a result of the referee's hearing. According to Konnor, had OLR accepted his offer for a public reprimand instead of demanding a 90–day suspension, this matter would have been resolved without a full evidentiary hearing before the referee.

¶ 4. We determine that Attorney Chris K. Konnor's professional misconduct as established by the clear and convincing evidence presented to the referee warrants a public reprimand. We also determine, for

286

reasons explained below, that Konnor should pay all the costs of these disciplinary proceedings in the amount specified, $11,365.06.

¶ 5. Respondent, Chris K. Konnor, was admitted to the practice of law in this state in April 1988 and practices in Milwaukee. He has never before been the subject of professional discipline but he has twice been administratively suspended for nonpayment of dues.

¶ 6. The OLR filed a complaint in this court alleging eight violations by Konnor of the rules of professional conduct. Those violations arose from Konnor's handling of the estate of B.B. who died intestate on February 20, 1997, survived by five brothers and the children of two brothers who had predeceased her.

¶ 7. Attorney Stanley Hack was appointed to act as referee in this matter, and after a hearing, he filed his report concluding that OLR had established by clear and convincing evidence that Konnor had committed the eight counts of misconduct as alleged.

¶ 8. As noted, neither side has appealed from the referee's report; consequently the facts are not now in dispute. Briefly summarized, the pertinent facts with respect to each of the eight counts are these:

## COUNT ONE

¶ 9. Attorney Chris K. Konnor was retained to handle the B.B. estate in March of 1997. After preliminary proceedings to determine heirs, Konnor was appointed as personal representative by the Milwaukee Deputy Register in Probate on October 6, 1997. The next day, Konnor opened a noninterest-bearing estate checking account for which, as the personal representative, Konnor had check writing authority. Konnor, however, did not arrange with the bank to have the

cancelled checks returned to him, nor did he regularly receive from the bank the cancelled checks for the estate until January 2002, after one of the beneficiaries had complained to OLR about Konnor's handling of the estate. That course of conduct, from 1997 to 2002, where Konnor failed to maintain complete records of the account he held in trust, led to Count One of the OLR complaint which alleged that Konnor had violated SCR 20:1.15(a) and (e).[1]

## COUNT TWO

¶ 10. At the time of her death, B.B. owned a rooming house with multiple rental units. After her death, one or more of her brothers moved into the rooming house and began collecting rent from the other tenants; however, these rental payments were not forwarded to Konnor for deposit in the estate's account. Konnor sent letters to the 12 tenants in the rooming house requesting that their rent be forwarded directly to him as the estate's personal representative. Initially, he received payment from several of the tenants, but after October 6, 1997, Konnor received rent payments from only one of the tenants; the rental payments from the other tenants continued to be received by two of B.B.'s brothers.

---

[1] Until January 1, 1999, SCR 20:1.15(a) provided that a lawyer shall hold in trust, separate from the lawyer's own property, property of clients or third persons "that is in the lawyer's possession in connection with a representation."

Effective January 1, 1999, SCR 20:1.15(a) was amended to provide that a lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and third persons that is in the lawyer's possession in connection with the representation "or when acting in a fiduciary capacity."

¶ 11. In a letter sent to a tax accountant in February 2000, Konnor stated that he believed the decedent's two brothers had "stole all the rents after the decedent died." Despite this, Konnor did not inform the probate court about any difficulty in collecting the rents, nor did he notify the police or take any steps to try to evict the tenants from whom he was not receiving rent.

¶ 12. This course of misconduct led to Count Two of the OLR complaint which alleged that instead of collecting rent from all of the tenants, including B.B.'s brothers, Konnor had allowed the brothers to misappropriate the rent from the estate without taking any action to protect the estate assets. By doing nothing to prevent these types of estate misappropriations, it was alleged that Konnor had failed to act with reasonable diligence and promptness, in violation of SCR 20:1.3.[2]

### COUNTS THREE, FOUR, AND FIVE

¶ 13. In July 1998 Konnor deposited several money orders he had received from the one tenant who had been making the rental payments directly to him. The dated money orders contained notations that they represented that tenant's rent for December 1997 and for January, February, March, April, June, and July of 1998. In January 1999 Konnor deposited another money order from that tenant dated August 3, 1998; again in February 2000, Konnor deposited another money order from that same tenant dated May 1, 1998. In his testimony before the referee, Konnor offered no explanation for these delayed deposits other than stating that he did not routinely travel to the area where the bank was located.

---

[2] SCR 20:1.3 provides: "Diligence. A lawyer shall act with reasonable diligence and promptness in representing a client."

¶ 14. The testimony before the referee also established that in October 1997 Konnor sent a letter to the heirs of the estate advising them that he was in the process of preparing the inventory; however, in April 1998 the inventory had yet to be filed and the probate court ordered Konnor to file it by June 11, 1998. Konnor failed to appear at that scheduled meeting and did not then file the inventory. The matter was rescheduled to July 9, 1998, and Konnor was warned that he could be removed as personal representative if he failed to appear at that hearing. Konnor finally filed the estate inventory on July 8, 1998, listing gross estate assets at $62,948.98. Konnor, however, had failed to provide all interested parties with a copy of that inventory. By letter dated November 13, 1998, the probate court advised Konnor that the estate had then been open for 14 months and that it would have to be closed within the next 4 months but a petition for an extension of time could be filed. At that time, a number of documents still remained to be filed in the estate including the final account and final judgment.

¶ 15. In January 1999 the decedent's rooming house was sold. Konnor, as personal representative, received two checks dated January 15, 1999, representing the proceeds of the sale. Those checks, however, were not deposited into the estate's checking account until May 1999.

¶ 16. On March 12, 1999, the probate court issued another order requiring Konnor to appear on May 27, 1999, to show cause why the final judgment had not yet been entered.

¶ 17. Between July 1999 and November 1999, Konnor's brother Stewart—who was homeless and who had a history of substance abuse as well as an extensive criminal history including convictions for theft—had

been allowed by Konnor's father to live in the building where Konnor's law office was located. Stewart Konnor had access to his brother's law office and stole the checkbook for the B.B. estate and then cashed six checks payable to himself (Stewart) totaling $3500. Chris Konnor had left that checkbook in an estate file on the floor next to his desk; neither the file nor the checkbook had been kept in a secure place.

¶ 18. After discovering the theft, Konnor deposited $3544 he had obtained from his father into the estate's checking account in February 2000. The checks Konnor had received from his father to pay back the money his brother had stolen from the estate, contained misleading notations about the purpose for which the checks from his father were intended. Konnor did not advise the police about the thefts from the estate's account nor did he inform the heirs or the court about the misappropriations. Only after OLR began its investigation into the grievances the heirs had filed, did Konnor disclose that the thefts had occurred; that disclosure was in Konnor's final account filed on May 15, 2004.

¶ 19. Based on this course of conduct, Count Three of OLR's complaint alleged that by not depositing the estate's funds into the trust account in a timely manner, Konnor had failed to keep those funds in trust, in violation of SCR 20:1.15(a).[3]

---

[3] SCR 20:1.15(a) (now renumbered as SCR 20:1.15(b)) provides: Safekeeping property.

(a) A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and third persons that is in the lawyer's possession in connection with a representation or when acting in a fiduciary capacity. Funds held in connection with a representation or in a fiduciary capacity include funds held as trustee, agent, guardian, personal representative of an estate, or

¶ 20. Similarly, Count Four alleged that by not taking any steps to lock his office or keep the estate checkbook in a secure location, Konnor had failed to safeguard the estate's funds and hold them in trust, in violation of SCR 20:1.15(a).

¶ 21. Count Five alleged that because Konnor had not reported the thefts to the police or the heirs, and had provided misleading notations with respect to where the reimbursement checks had come from and for what purposes they had been received, Konnor had engaged in conduct that was deceitful and conduct that amounted to misrepresentation by omission, in violation of SCR 20:8.4(c).[4]

otherwise. All funds of clients and third persons paid to a lawyer or law firm shall be deposited in one or more identifiable trust accounts as provided in paragraph (c). The trust account shall be maintained in a bank, savings bank, trust company, credit union, savings and loan association or other investment institution authorized to do business and located in Wisconsin. The trust account shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import. No funds belonging to the lawyer or law firm, except funds reasonably sufficient to pay or avoid imposition of account service charges, may be deposited in such an account. Unless the client otherwise directs in writing, securities in bearer form shall be kept by the attorney in a safe deposit box in a bank, savings bank, trust company, credit union, savings and loan association or other investment institution authorized to do business and located in Wisconsin. The safe deposit box shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import. Other property of a client or third person shall be identified as such and appropriately safeguarded. If a lawyer also licensed in another state is entrusted with funds or property in connection with an out-of-state representation, this provision shall not supersede the trust account rules of the other state.

[4] Specifically, regarding the latter count, it was alleged that Konnor had made misrepresentations by omissions because he failed to advise the heirs that his brother had stolen from the

## COUNTS SIX, SEVEN, AND EIGHT

¶ 22. In February 2000 Konnor retained a tax accountant to prepare the estate's tax returns and the decedent's personal income tax returns. In January of 2001 the accountant sent Konnor completed tax forms for 1996, 1997, 1998, and 1999. Although penalties and interest had resulted from the late filing of the returns, Konnor failed to advise the heirs about the penalties or interest.

¶ 23. On May 25, 2001, Konnor liquidated the estate's mutual funds and deposited the proceeds in a noninterest-bearing account having a balance of over $61,000. In May 2001 Konnor wrote to the heirs for the first time since October 1997, informing them that all of the tax returns had been filed except for the 2001 returns which Konnor wrote would be filed in the near future.

¶ 24. Konnor later advised the heirs that he would be making distributions and closing the estate. On January 15, 2002, Konnor filed a Department of Revenue form required for a fiduciary closing of an estate; he also asked the accountant to complete the final tax return for the estate. The information he provided revealed that for an extended period of time, more than $58,000 of the estate's funds had remained in a non-interest bearing account.

¶ 25. Subsequently the probate court ordered Konnor to file the final account by April 8, 2003; he did not do so. At an April 15, 2003, hearing, Konnor told the court that he had problems balancing the final account.

estate, and then had further attempted to cover up the thefts by depositing into the estate account four separate checks from Konnor's father with misleading notations.

¶ 26. Konnor finally filed the final account on May 15, 2003, and distributions were made to the various heirs in July 2003.

¶ 27. This course of conduct led to Count Six of the OLR complaint which alleged that by failing to provide the heirs with a copy of the inventory, by failing to notify the heirs of the misappropriation of the estate funds, and by failing to notify the heirs of the penalties the estate had incurred with respect to the late tax filings, Konnor had failed to explain a matter to the extent reasonably necessary to permit the heirs to make informed decisions regarding the representation, in violation of SCR 20:1.4(b).[5]

¶ 28. Similarly, in Count Seven, OLR alleged that by depositing large sums of the estate's assets into a noninterest-bearing checking account for extended periods of time, Konnor had violated SCR 20:1.15(c)(1)a.[6]

¶ 29. Finally, in Count Eight, OLR alleged that by failing to close the estate for more than five years, Konnor had failed to act with reasonable diligence and promptness, in violation of SCR 20:1.3.[7]

¶ 30. After determining that OLR had proven by clear and convincing evidence all eight counts of misconduct as alleged in its complaint, the referee then turned to an appropriate sanction to be recommended

---

[5] SCR 20:1.4(b) provides: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

[6] SCR 20:1.15(c)(1)a. provides: "IOLTA accounts. A lawyer who receives client funds shall maintain a pooled interest-bearing, demand account for deposit of client or 3rd-party funds that are: a. nominal in amount or expected to be held for a short period of time."

[7] SCR 20:1.3 provides: "Diligence. A lawyer shall act with reasonable diligence and promptness in representing a client."

for Konnor's misconduct. In his report, the referee identified several aggravating factors including the number of rules violations Konnor had committed, his serious neglect of the probate matter, Konnor's lack of concern in keeping the heirs advised of the status of the matter over a number of years, and his lack of proper handling of estate assets. Balanced against those aggravating factors, the referee noted several mitigating factors including Konnor's cooperativeness with OLR, his lack of a history of prior professional discipline, the fact that Konnor had not misappropriated any of the estate's assets for his own use, his good faith effort to restore the assets stolen by his brother, and finally, his remorse. The referee recommended, in light of prior cases with similar facts, that a public reprimand was an appropriate sanction for Konnor's professional misconduct. The referee also recommended that Konnor be required to pay all the costs of the disciplinary proceeding now totaling $11,365.06.

¶ 31. As noted, the only matter in dispute before this court is Konnor's request that he be absolved from paying all of the costs; he maintains that he should only pay those costs incurred before the referee's hearing because Konnor had previously offered to accept a public reprimand which was the same sanction ultimately recommended by the referee. According to Konnor, had the OLR agreed to a public reprimand at the time, there would have been no need for the public hearing before the referee.

¶ 32. Although under SCR 22.24(1) this court has discretion to assess all or a portion of the costs of the disciplinary proceeding in which misconduct has been found against the respondent, this court very infrequently reduces the reasonable costs as requested by

the OLR. There is no claim in the instant case that the costs requested by OLR are excessive or unreasonable. Under these circumstances we decline Konnor's request to reduce the costs.

██

¶ 33. We note, however, that questions concerning appropriate costs in OLR matters have frequently been before this court. Consequently, we have asked the Board of Administrative Oversight in conjunction with the State Bar, to develop a comprehensive approach regarding the assessment of costs in OLR matters and to present the proposals to this court for our consideration.

¶ 34. We adopt the findings of fact and conclusions of law as set forth in the referee's report because they are supported by clear and convincing evidence. We determine that the seriousness of Attorney Konnor's misconduct as established in this proceeding warrants a public reprimand. And, we direct that Attorney Konnor pay the costs of these disciplinary proceedings now totaling $11,365.06.

¶ 35. IT IS ORDERED that Chris K. Konnor is publicly reprimanded for professional misconduct.

¶ 36. IT IS FURTHER ORDERED that within 60 days of the date of this order Chris K. Konnor pay to the Office of Lawyer Regulation all the costs of this proceeding provided that if such costs are not paid within the time specified and absent a showing to this court of his inability to pay the costs within that time, the license of Chris K. Konnor to practice law in Wisconsin shall be suspended until further order of this court.

¶ 37. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I write to provide some context and perspective

regarding costs in disciplinary proceedings. First, some background about the lawyer regulation system. Second, facts about costs for the fiscal years July 1999 through June 2004. Third, the dissenting opinions (in seven cases) during these years objecting to the levying of full costs on the lawyer involved. Fourth, alternatives the court might consider in levying costs on the lawyer involved. Fifth, given this discussion, where do we go from here.

I

¶ 38. To put costs in context and perspective, it is helpful to have some background about the lawyer regulatory system and the rules regarding costs.

¶ 39. The Code of Professional Responsibility and the provisions for the lawyer regulatory system have always been designed to protect the public from lawyers' unethical conduct and to protect lawyers from unfounded and unproven charges. In 2000 the court revamped the lawyer regulation system to provide more protections for lawyers, complainants, and the public. In adopting the change, the court heard from representatives of the State Bar of Wisconsin and the American Bar Association, individual lawyers, and the public. The court also consulted with a mediator, Kenneth Feinberg, about the operation of the then-existing lawyer regulatory system.

¶ 40. The Office of Lawyer Regulation, as created effective October 1, 2000, was designed to provide a series of checks and balances to better protect the public and lawyers. The entire OLR system is overseen by a Board of Administrative Oversight composed of lawyers and public members. Before a complaint is filed against a lawyer, an independent panel composed of

lawyers and public members must find probable cause to proceed against the lawyer. If a complaint is dismissed, the complainant can get a review of the dismissal. If a complaint is filed, a referee determines the facts and whether violations have occurred, and recommends discipline. The Supreme Court ultimately establishes the facts, the violation, and the discipline.

¶ 41. The lawyer regulatory system is presently totally funded by annual assessments on the lawyers licensed to practice in the state, not by the state.[1] For fiscal year July 2004–June 2005, each member of the bar was assessed $132.00. An individual lawyer who is subject to a disciplinary proceeding, a medical incapacity proceeding, or a reinstatement proceeding may be ordered to pay all or part of the costs of his or her proceeding, thus reducing the total operating expenses of the lawyer regulatory system and the assessment on each member of the state bar.

¶ 42. Since 1970, two types of expenditures have been present in the lawyer regulatory system: (1) general administrative expenses, and (2) costs of proceedings against a particular lawyer. The state and the members of the state bar have, over the years, provided financial support for the general administrative expenses of the lawyer regulatory system since 1970. Costs of a proceeding against an individual lawyer during this period could be levied against that lawyer.

¶ 43. In 1970 the state paid all the expenses incurred by the Board of Bar Commissioners, the administrative entity governing the lawyer regulatory system. The state's expenditures for the system were reduced to the extent that the costs of formal proceed-

---

[1] SCR 21.21 (Wis. Stat. Ann. 2001–02).

ings against an individual attorney were recovered from the attorney involved in the proceedings.[2]

¶ 44. In 1976, when the Board of Attorneys Professional Responsibility (BAPR) replaced the Board of Bar Commissioners, only the expenses of formal proceedings were paid by the state.[3] The general expenses of administering the lawyer regulatory system were imposed on the members of the state bar. Costs were apparently still levied against individual lawyers.

¶ 45. In 1981–82 the members of the state bar became responsible for funding in full the lawyer regulatory system. The Joint Finance Committee of the State Legislature eliminated state funding for the lawyer regulatory system and imposed the expenses of the system on members of the state bar.[4] Continuing past practice, the Supreme Court permitted BAPR to collect from an individual attorney the costs incurred in his or her disciplinary proceeding, reinstatement proceeding, or moral character investigation.[5]

---

[2] Wis. Stat. § 256.283(8)(d)(9) (1971).

[3] *In re Regulation of the Bar of Wisconsin,* 74 Wis. 2d ix (1976).

[4] 1981–82 BAPR Annual Report.

[5] 1981–82 BAPR Annual Report.

In 1979 a rule amendment provided that BAPR or the referee (and in 1980 the court) could assess the individual lawyer for direct and indirect costs of a litigated proceeding. *In the Matter of Promulgation of Supreme Court Rules,* filed Dec. 11, 1979 (on file with the Clerk of Supreme Court, Madison, WI). The rules did not define direct and indirect costs.

In December 1980 the court amended the rule to define costs. Costs were defined in essentially the same way as in the current rule, but the costs did not explicitly include BAPR's attorney fees in formal proceedings. *In the Matter of the Amendment of Supreme Court Rules Governing Enforcement of*

¶ 46. Thus, since at least 1970, Wisconsin has authorized levying on an individual attorney all or a portion of the costs incurred in that attorney's disciplinary proceedings.

¶ 47. Similarly, the present supreme court rules provide for the levying of all or a portion of the costs on the individual lawyer in any proceeding in which misconduct is found, in which medical incapacity is found, and in which reinstatement is granted or denied after license suspension.[6]

¶ 48. Costs in individual discipline, medical incapacity, and reinstatement proceedings are defined in the rules as follows:

- Compensation and necessary expenses of referees;

- Fees and expenses of counsel for the Office of Lawyer Regulation;

- Reasonable disbursements for service of papers;

---

*Attorney Professional Responsibility (SCR Chapters 11, 21 and 22),* filed Dec. 29, 1980 (on file with the Clerk of Supreme Court, Madison, WI) (creating SCR 22.01(6m) and amending 22.10). Apparently the practice was to assess the individual attorney for costs incurred in formal proceedings involving that attorney.

In 1985 the rule on costs was amended so that the Supreme Court may assess all or part of the costs of the proceedings in which it acted and BAPR may assess all or part of the costs of a proceeding in which the board imposes discipline. *In the Matter of the Amendment of Supreme Court Rules Governing Enforcement of Attorneys Professional Responsibility: SCR 22.20,* filed May 28, 1985 (on file with the Clerk of Supreme Court, Madison, WI). *See* SCR 22.20, 22 (Wis. Stat. Ann. 1997–98).

[6] SCR 22.24 (Wis. Stat. Ann. 2001–02).

- Amounts actually expended for certified copies of public records, postage, telephone, adverse examinations and depositions, witness fees and expenses, compensation and reasonable expenses of experts and investigators employed on a contractual basis; and

- Costs and fees authorized by chapter 814 of the statutes.[7]

## II

¶ 49. I move now to analyze the costs levied on individual attorneys from the beginning of fiscal year 1999 (July 1, 1999) through calendar year 2004. Some of these cases were initiated by BAPR and completed by OLR; others were initiated and completed by OLR.

¶ 50. Costs are not levied when no violation is proved or when a stipulation is reached before a referee is appointed. Otherwise the general practice of the court has been to levy the full costs of the discipline, medical incapacity, or reinstatement proceeding on the lawyer involved. If a lawyer cannot pay the full costs immediately, an agreement may be reached to enable the lawyer to pay the costs over time. If a lawyer is indigent, all or part of the costs are waived.

¶ 51. During this five-year period the court decided 123 disciplinary cases, 83 of which were contested and 40 of which were stipulated. The court also decided 15 reinstatement cases (all of which involved formal proceedings and involved costs) and three medical incapacity cases (all resolved by stipulation with no costs). In only seven cases did one or more justices dissent from levying full costs, and advocate instead

---

[7] SCR 22.001(3) (Wis. Stat. Ann. 2001–03). *See also* SCR 22.01(6m) (Wis. Stat. Ann. 1995–96).

levying partial costs; five were contested disciplinary cases and two were reinstatement proceedings.[8]

---

[8] Justice Prosser's concurrence/dissent (agreeing with discipline but dissenting from levy of full costs; urging remand to referee for apportionment of costs without providing guidance for apportionment); *OLR v. Polich,* 2005 WI 36, ¶ 34, 279 Wis. 2d 266, 694 N.W.2d 367 (Prosser, J., agreeing with discipline imposed but dissenting on costs; dissenting from levy of full costs; urging remand to referee for apportionment of costs without providing guidance for apportionment; not fully subscribing to Justice Butler's methodology of apportioning costs; Butler, J., agreeing with discipline imposed but dissenting from levy of full costs; urging remand to the referee to apply a rule either that "costs associated *exclusively* with the unsuccessful prosecution of a [lawyer] on specific counts may not be assessed against that [lawyer]," ¶ 39 (emphasis in original) or that costs incurred in dismissed counts that are not substantially related to successfully charged counts may not be assessed against the lawyer, ¶ 42); *OLR v. Trewin,* 2004 WI 116, ¶¶ 53–62, 275 Wis. 2d 116, 684 N.W.2d 121 (Prosser, J., agreeing with discipline but dissenting from imposition of full costs exceeding $25,000 because some of the counts were dismissed; no statement of what would be reasonable costs or explanation of how to calculate reasonable costs, except for a reference at ¶ 56 to a reader having a hard time "keeping score" of counts proved and not proved); *OLR v. Marks,* 2003 WI 114, ¶ 90, 265 Wis. 2d 1, 665 N.W.2d 836 (Prosser, J., agreeing with discipline but dissenting from costs of $22,178.69 as disproportionate to seriousness of offense and as reflecting a desire by OLR to appeal the referee's finding; no statement of what would be reasonable costs or explanation of how to calculate reasonable costs); *OLR v. O'Neil,* 2003 WI 48, ¶ 23, 261 Wis. 2d 404, 661 N.W.2d 813 (Bablitch, Prosser, and Sykes, JJ., agreeing with discipline but dissenting from levy of full costs as excessive without explanation or discussion of what would be reasonable costs); *OLR v. Webster,* 2002 WI 100, ¶ 59, 255 Wis. 2d 323, 647 N.W.2d 831 (Prosser, J., dissenting from decision not to reinstate and objecting without any explanation or discussion to "whopping

¶ 52. To evaluate the functioning of OLR and costs, here are some facts for these five fiscal years:

- Misconduct was found on all counts in 66 of the 83 contested disciplinary cases, or in 80% of contested cases.

- Misconduct was found on some (but not all) counts in 11 of the 83 contested disciplinary cases, or in 13% of contested disciplinary cases.

- All counts were dismissed in 6 of the 83 contested disciplinary cases, or in 7% of contested disciplinary cases and no costs were levied.

- In the 15 reinstatement cases, 10 reinstatements were granted and 5 were denied.

- The costs in the 92 disciplinary and reinstatement proceedings during this period in which costs were levied ranged from a few hundred dollars to the five highest costs of almost $52,000, $27,500, $22,500, $21,800, and $20,500. The average total cost levied on an individual lawyer for the 92 cases in this period in which costs were levied was $6170.

- Costs in the 92 disciplinary and reinstatement proceedings in which costs were levied on an individual lawyer were less than $4000 in 54

sum" of $9,121.75 costs); *OLR v. Penn,* 2002 WI 5, ¶¶ 15–28, 249 Wis. 2d 667, 638 N.W.2d 287 (Bablitch and Prosser, JJ., agreeing with reinstatement but dissenting from levy of full costs of $6,803.24 as seven times that levied in another matter decided the same day but under older rules; no statement of what would be reasonable costs or explanation of how to calculate reasonable costs). For further discussion of these cases, see Part III.

cases (58% of the cases), between $4000 and $10,000 in 20 cases (22% of the cases), and between $10,000 and $20,000 in 13 cases (15% of the cases), and over $20,000 in 5 cases (5% of the cases). Of those 18 cases in which costs exceeded $10,000, one was a reinstatement case, in which reinstatement was denied.

- Attorney fees in the 92 disciplinary and reinstatement cases in which costs were levied on an individual lawyer ranged from $289 to a high of $32,400. Attorney fees comprised about 63% of the total costs levied.

- Costs levied for the five fiscal years totaled $569,071. OLR collected $431,958 in costs during the same period.

### III

¶ 53. I know of only one case during this period in which the court levied less than full costs. Dissenting opinions in seven cases have objected to the levy of full costs on an individual lawyer from July 1, 1999 through this case. The dissents have varied in length, vigor, and vitriol, as is each justice's prerogative.

¶ 54. Although much heat has been generated about costs in some of the seven cases, including this one, unfortunately little light has been shed on the subject.

¶ 55. Except for the dissent in *Polich* (mandated today), proposing that costs be levied on the basis of counts proved,[9] the other dissenting opinions offer no

---

[9] *OLR v. Polich,* 2005 WI 36, 279 Wis. 2d 266, 694 N.W.2d 367 (Butler, J., concurring on discipline and dissenting on levy of full costs; urging remand to the referee to apply a rule either that

304

principles, criteria, or guidelines to assist the court in fairly and equitably exercising its discretion to levy less than full costs.

¶ 56. In determining reasonable attorney fees, the court has adopted in non-disciplinary cases the lodestar approach for calculating attorney fees: The reasonable number of hours is multiplied by the reasonable hourly rate. Supreme Court Rule 20:1.5(a) lists factors to be considered in determining the reasonableness of a fee. The lodestar approach is the approach actually used for attorney fees charged in disciplinary cases. In an OLR matter, OLR must submit evidence supporting the hours worked. The hourly rate is fixed at $60 by supreme court rule.[10]

¶ 57. In three of the seven cases in which there has been a dissent on full costs levied on the lawyer involved, the dissent merely objected to levying full costs without explaining what a reasonable levy might be.[11]

---

"costs associated *exclusively* with the unsuccessful prosecution of a [lawyer] on specific counts may not be assessed against that [lawyer]," at ¶ 39 (emphasis in original) or that costs incurred in dismissed counts that are not substantially related to successfully charged counts may not be assessed against the lawyer, at ¶ 42)).

Justice Prosser does not fully subscribe to Justice Butler's methodology but joins in seeking a remand to the referee for an apportionment of costs. *OLR v. Polich,* 2005 WI 36, ¶ 34, 279 Wis. 2d 266, 694 N.W.2d 367 (Prosser, J., concurring and dissenting).

[10] *See Kolupar v. Wilde Pontiac Cadillac, Inc.,* 2004 WI 112, 275 Wis. 2d 1, 683 N.W.2d 58.

[11] *See O'Neil,* 261 Wis. 2d 404, ¶ 23 (Bablitch, Prosser, and Sykes, JJ., agreeing with decision not to reinstate and objecting without any explanation or discussion about costs); *Webster,* 255 Wis. 2d 323, ¶ 59 (Prosser, J., dissenting from decision not to reinstate and objecting without any explanation or discussion to

¶ 58. In *OLR v. O'Neil,* 2003 WI 261, 261 Wis. 2d 404, 661 N.W.2d 813, the attorney disclosed extensive information to police about meeting with his client, Erik Garcia, regarding a divorce. Garcia's wife was found dead the same day Attorney O'Neil filed the divorce petition; Garcia called to request a refund of the fee because he no longer needed a divorce. In several subsequent interactions with the police, Attorney O'Neil disclosed the details of conversations with his client and turned over his divorce file, without consulting with Garcia or invoking the attorney-client privilege. Garcia was later convicted of first-degree intentional homicide in the death of his wife.

¶ 59. The referee recommended that a public reprimand be imposed for several reasons: None of the disclosed files or information from Attorney O'Neil was used in Garcia's prosecution; Garcia did not make an issue of the disclosure at his trial; O'Neil claimed he was trying to help Garcia; and O'Neil cooperated with OLR. The referee recommended that Attorney O'Neil pay the full costs of the proceedings ($11,438.82). This court agreed with the reduced penalty and the levy of full costs.

¶ 60. Justices Bablitch, Prosser, and Sykes agreed with the discipline imposed but dissented in a one-sentence dissent from the levy of full costs as excessive, without explanation or discussion of what would be reasonable costs. In his concurring and dissenting opin-

"whopping sum" of $9121.75 costs); *Penn,* 249 Wis. 2d 667, ¶¶ 15–28 (Bablitch and Prosser, JJ., agreeing with reinstatement but dissenting from levy of full costs of $6893.24 as seven times that levied in another matter decided the same day but under prior rules; no statement of what would be reasonable costs or explanation of how to calculate reasonable costs).

ion in the present case, Justice Prosser classifies this case as one that was over-litigated.[12]

¶ 61.　In *OLR v. Webster,* 2002 WI 100, 255 Wis. 2d 323, 647 N.W.2d 831, the referee recommended the denial of Attorney Webster's petition for reinstatement to practice law in Wisconsin. Attorney Webster's license to practice law was suspended "for two years following his felony conviction in federal court on the charge of aiding and abetting the fraudulent concealment of a debtor's property from a bankruptcy trustee."[13] Following his release from federal prison, the referee found that Attorney Webster, in a series of minor infractions, had engaged in the unauthorized practice of law. The referee noted that individually these offenses did not necessarily require that Attorney Webster's petition be denied, but that cumulatively they rendered Attorney Webster unable to overcome the requisite burden imposed by law for reinstatement. This court agreed and ordered costs to be paid in the amount of $9121.75 ($7224.10 for the proceedings before the referee; $1897.65 for the costs incurred during the appeal).

¶ 62.　The dissenting justice argued for reinstatement, characterizing the infractions as "molehills of unauthorized practice" being elevated to great heights and the costs as a "whopping sum."[14]

¶ 63.　In *OLR v. Penn,* 2002 WI 5, 249 Wis. 2d 667, 638 N.W.2d 287, Attorney Penn petitioned for reinstatement to practice law in Wisconsin after a suspension following six misdemeanor drug convictions. This court agreed with the referee that reinstatement was warranted. The court imposed the reinstatement proceedings costs totaling $6803.64 on Attorney Penn, but

[12] Justice Prosser's concurrence/dissent, ¶ 105.

[13] *Webster,* 255 Wis. 2d 323, ¶ 1.

[14] *Id.,* ¶¶ 58–59 (Prosser, J., dissenting).

allowed Attorney Penn one year to pay rather than the six months recommended by the referee. Two justices concurred in the reinstatement but dissented from the court's levying full costs on the lawyer. Attorney Penn objected to proceeding under the new OLR rules for reinstatement but did not object to the costs. The dissenting justices objected to the costs compared to those that would have been imposed under the prior procedure.[15]

¶ 64. In a fourth case, *OLR v. Trewin,* 2004 WI 116, 275 Wis. 2d 116, 684 N.W.2d 121, the referee found that Attorney Trewin violated several rules involving more than one client. The referee recommended a five-month suspension and payment of full costs. This court agreed.

¶ 65. Attorney Trewin objected to costs exceeding $25,000 on the ground that many of the facts were undisputed and that much of the OLR costs related to dismissed claims that were not challenged on appeal or were unreasonably incurred in excessive and redundant discovery. The court noted that the determination of whether those undisputed aspects of his case amounted to disciplinary violations was "hotly contested."[16]

¶ 66. The *Trewin* dissent (on costs, but not discipline) asserted that "in retrospect" certain counts "were overpled."[17] Retrospect is far from perfect. OLR's losing on a charge is not necessarily the equivalent of overpleading.

---

[15] *Penn,* 249 Wis. 2d 667, ¶¶ 15–28 (Prosser and Bablitch, JJ., dissenting from levying of full costs).

[16] *Trewin,* 275 Wis. 2d 116, ¶ 49.

[17] *Id.,* ¶ 62 (Prosser, J., concurring in the discipline but dissenting from the levying of full costs). In the present case; the dissent characterizes the *Trewin* case as over-litigated. Justice Prosser's concurrence/dissent, ¶ 107.

¶ 67. The *Trewin* dissent asks whether the "cost assessment in some disciplinary proceedings is consistent with the lodestar methodology or whether it is driven by nothing more than OLR's legitimate need for funding and [the court's] cold-blooded political determination that additional costs not be assessed to the members of the state bar." "Both of these factors are reasonable," concludes the dissent, "but not if they completely override the element of fair play to a respondent attorney."[18] In my opinion, neither of these factors is reasonable under any conditions. Furthermore, neither factor has been asserted as justifying the levy of costs in any proceeding.

¶ 68. In a fifth case, *OLR v. Marks,* 2003 WI 114, 265 Wis. 2d 1, 665 N.W.2d 836, the referee recommended that Attorney Marks be suspended for 60 days based on a finding that Attorney Marks engaged in intentional misrepresentation in violation of SCR 20:8.4(c) when he wrongfully "notif[ied] two insurance companies that he maintained a lien on the proceeds for 25 percent of his former client's recovery in a personal injury wrongful death claim," contrary to the plain language of the fee agreement.[19] The referee dismissed two claims that were filed against Attorney Marks under the Michigan Rules of Professional Conduct. The court disagreed with the dismissal but did not remand the matter in the interest of judicial economy. Attorney Marks argued that a 60–day suspension was too long.

---

[18] *Trewin,* 275 Wis. 2d 116, ¶ 62 (Prosser, J., concurring in the discipline but dissenting from the levying of full costs). The dissent states at ¶ 62 that it would adjust some of the costs to reflect Trewin's success in defending himself against some of OLR's charges but fails to state how it would do so.

[19] *Marks,* 265 Wis. 2d 1, ¶ 44.

We agreed with the referee, noting that Attorney Marks had been reprimanded on three separate occasions.

¶ 69. The dissent asserted that the costs were disproportionate to the seriousness of the offense and "in part reflect OLR's obsession to appeal an issue that it lost before the referee."[20]

¶ 70. In a sixth case mandated this same day, *OLR v. Polich,* 2005 WI 36, 279 Wis. 2d 266, 694 N.W.2d 367, one dissent proposes levying costs on the basis of counts proved.[21] We rejected this methodology in several cases, most recently in *In re Pangman,* 216 Wis. 2d 440, 574 N.W.2d 232 (1998), without explanation. The other dissent does not fully subscribe to this methodology but joins in seeking a remand to the referee for an apportionment of costs.[22]

¶ 71. The fairness of this approach is open to question. For example, Attorney Polich failed to comply

[20] *Id.,* ¶ 90 (Prosser, J., dissenting). In the present case, the concurrence/dissent characterizes the *Marks* case as over-litigated. Justice Prosser's concurrence/dissent, ¶ 106.

[21] *Polich,* 2005 WI 36, (Butler, J., concurring in discipline but dissenting from levy of full costs; urging remand to the referee to apply a rule either that "costs associated *exclusively* with the unsuccessful prosecution of a [lawyer] on specific counts may not be assessed against that [lawyer]," at ¶ 39 (emphasis in original) or that costs incurred in dismissed counts that are not substantially related to successfully charged counts may not be assessed against the lawyer, at ¶ 42).

Justice Prosser does not subscribe fully to Justice Butler's methodology but joins in seeking a remand to the referee for an apportionment of costs. *Polich,* 2005 WI 36, ¶ 34 (Prosser, J., concurring in discipline but dissenting from levying of full costs). Justice Prosser characterizes the *Polich* case as over-litigated. Justice Prosser's concurrence/dissent, ¶ 108.

[22] *Polich,* 2005 WI 36, ¶ 34 (Prosser, J., concurring in discipline but dissenting from levying of full costs).

with CLE requirements. His office received notification of his problem and suspension of his license by certified mail. OLR was justified in prosecuting Polich for practicing without a license, even though these counts were dismissed. Attorney Polich's defense was that his staff failed to notify him that he was suspended. As the referee stated, the attorney's explanation is susceptible to skepticism. The referee judged the credibility of the witnesses, and this court must abide by the referee's determination of credibility, even though we too are skeptical of Attorney Polich's explanation for the counts that were dismissed.

¶ 72. Nothing in the record indicates that the counts on which Attorney Polich prevailed were without prosecutorial merit or that the OLR costs were unreasonable or unnecessary. Attorney Polich's conduct caused this prosecution to proceed on all the counts. Why should the costs Attorney Polich caused OLR to incur be shifted to all the other attorneys of the state who are innocent of any wrongdoing? Between the members of the state bar and Attorney Polich, why should the members pay for any part of the prosecution Polich (who was disciplined) caused?

¶ 73. In the present case, the seventh case, the dissent charges the Office of Lawyer Regulation with over-litigating four cases.[23] The only evidence given for the charge of over-litigating is that OLR did not prevail on all counts. No hearing was held by the referee or this court on the issue of the reasonableness of the costs incurred in any of the cases; neither the OLR nor the lawyer involved had an opportunity to explain the costs or rebut the charge of over-litigating in any of the cases.

---

[23] Justice Prosser's concurrence/dissent, ¶¶ 105–108. The four cases are *O'Neil, Marks, Trewin,* and *Polich.*

I do not think that the court or any justice should make unsubstantiated charges that either OLR staff or retained counsel over-litigated a case.

¶ 74. No one has accused the lawyers representing OLR in any of these cases of padding their hours, that is, misstating the number of hours worked. Everyone agrees they spent the hours reported. Rather, a dissenting justice has sometimes opined that the OLR lawyer should have spent less time on the case.

¶ 75. OLR staff lawyers get paid regardless of the hours they spend on particular cases. They have more than enough work to keep busy working efficiently on the cases they have. They need not spend excess time on a case.

¶ 76. Retained counsel take OLR cases as a public service and are paid $60 an hour, a rate far below the market rate for legal work. A lawyer retained in an OLR case is lucky to cover his or her office overhead, much less turn a profit. There is simply no incentive for retained counsel to over-litigate under these circumstances, that is, to spend too many hours on an OLR case! Time spent at $60 per hour cannot be spent on cases that pay more. As one lawyer retained by OLR joked at a recent seminar, "I get paid $60.00 per hour for OLR work. I don't ask an extra question."

¶ 77. In the present case, the dissent charges that OLR utilized different procedures in two cases that straddled the change from BAPR to OLR so as to increase the costs in the case using the new OLR procedure.[24] Implicit is an allegation that OLR improperly manipulated the procedure to increase attorney fees or obtain a favorable recommendation. Nothing in the record supports any such inference.

---

[24] Justice Prosser's concurrence/dissent, ¶¶ 103–104.

¶ 78. Finally, the dissent in the present case asserts that several policy questions should be addressed (and they are good ones) but fails to advance the discussion of these policy issues. The dissent poses as one policy question, "What factors should this court consider when a disciplined attorney moves to reduce full costs?"[25] The dissent does not answer its own question (and has not answered this question in its prior dissents), other than recommending in the present case that the case be remanded to the referee to levy costs (without giving any guidance to the referee). Nevertheless the question deserves a response.[26]

## IV

¶ 79. Shifting costs to a losing party is a troublesome issue in the American system, and states vary considerably in their approaches to costs incurred in individual cases in the lawyer regulatory system. Some states impose no costs on the disciplined attorney; others impose a standard fee that varies with the level of discipline or stage of the proceeding. Still other states, like Wisconsin, levy all costs on the individual lawyer, absent a showing of an inability to pay. Each alternative for dealing with costs has its own set of advantages and pitfalls.

¶ 80. In the hope that I might advance the discussion about costs, let me present a list of several alternatives for dealing with costs. The list is not exhaustive. Until an attempt is made to articulate and discuss

---

[25] *Id.,* ¶ 111.

[26] On what basis then does the dissent charge that under the present cost structure the OLR is not accountable "in terms of overcharging, over-litigating, or failing to prove its case"? Justice Prosser's concurrence/dissent, ¶ 100.

313

alternatives, the debate about costs will continue in a relatively unproductive manner. As I see it, here are some alternatives:

¶ 81. (1) The court can retain the present system, namely that the court levy all or part of the costs against the lawyer involved. These costs include such things as the cost for the referee and court reporter, as well as reasonable disbursements and attorney fees. The advantage of this alternative is it gives the court discretion to allocate fairly the costs in each case. The disadvantages are that no principles, criteria, or guidelines have been developed for levying partial costs, and that a justice may dispute the costs on a hunch, without taking any testimony or considering any evidence, that the costs are too high.

¶ 82. Alaska has set forth factors for the court or the board to consider in imposing costs and fees on a lawyer when a finding of misconduct is made, including the following: the complexity of the disciplinary matter; the duration of the case; the reasonableness of the number of hours expended by counsel and the reasonableness of the costs incurred; the reasonableness of the number of counsel used; and counsel's efforts to minimize fees.

¶ 83. If Wisconsin retains the present system of allowing the levy of partial costs, this court should adopt criteria for the imposition of costs and require the referee to levy costs. A referee is in a better position than the justices of this court to levy costs: The referee is often a practicing lawyer with experience in keeping time sheets, has prepared cases, and is familiar with billing norms. Even if the referee is not a practicing lawyer, the referee has witnessed first-hand the quality of services rendered and can take testimony on the reasonableness of the costs.

314

¶ 84. (2) The court can adopt a bright-line rule that the court shall levy all costs against the lawyer. The advantage of such a rule is certainty and uniformity. But not all cases are the same. The disadvantage is that without court discretion, unfairness may result.

¶ 85. (3) The court can adopt a bright-line rule that no costs be levied against the lawyer involved. The advantage of such a rule is certainty and uniformity; it is simple to administer. All members of the state bar would bear the expenses of prosecuting individual cases rather than the individual lawyer involved. If the court were to adopt this alternative, the assessment of each member of the state bar would probably increase by about $5.00 per year, a relatively small amount.

¶ 86. (4) The court can adopt a rule that the court (or referee) shall levy costs on the basis of the counts successfully proved against the lawyer, if the lawyer is found guilty of some of the charges. One of the *Polich's* dissents proposes this solution and suggests two ways of allocating costs on the basis of counts proved and dismissed. Both solutions are not as easy or as fair in application as they might initially sound. Costs do not necessarily increase proportionally with the number of counts, some of which are proved and some not, and the members of the bar upon whom costs are imposed are innocent, while the disciplined lawyer is not.

¶ 87. (5) The court can adopt a rule that all costs shall be levied against the lawyer except the attorney fees. Attorney fees seem to have generated the most discussion in the court and eliminating the levy of attorney fess would substantially reduce costs levied against the lawyer involved. Under this proposal attorney fees would be treated as administrative costs to be funded by an increased assessment imposed on all members of the state bar. This alternative is proposed

by a petition by Keith L. Sellen, Director of the Office of Lawyer Regulation recently filed in this court. It will be heard sometime in the fall of 2005.

¶ 88. (6) The court can adopt a rule levying a fixed or graduated administrative fee rather than an expense-based amount. Several states employ this technique. Under this system, probably a much smaller amount would be collected from the lawyer involved.

¶ 89. No method has clearly distinct advantages over imposing full costs on a disciplined lawyer or is free from significant pitfalls.

## V

¶ 90. The fundamental issue presented is who should fund the costs incurred to prosecute individual cases against disciplined lawyers: The disciplined lawyer against whom proceedings were brought after probable cause was found, or the members of the bar? And in what proportion should these costs be borne? The court has asked the Office of Lawyer Regulation, the Board of Administrative Oversight, and the state bar to consider this issue and report to the court. A petition has been filed recently.

¶ 91. In the absence of a proposal that has been clearly articulated, debated, and adopted, I conclude that levying partial costs without any principles, criteria, or guidelines degenerates into unbridled discretion. We demand that circuit courts exercise discretion according to principles. And rightly so. We demand that circuit courts explain their exercise of discretion. And rightly so. We should hold ourselves to this same high standard. Therefore I conclude that full costs should be levied on the lawyer disciplined until the court can levy partial costs according to established principles.

¶ 92. For the reasons set forth, I write separately, in the hope that with costs put in perspective and context, we can develop a sound proposal for determining whether and when partial costs should be levied.

¶ 93. DAVID T. PROSSER, J. (*concurring in part, dissenting in part*). I agree with the public reprimand of Attorney Chris K. Konnor but dissent from the court's decision to levy the full cost of the disciplinary proceeding against him.

¶ 94. In this case, Attorney Konnor offered to stipulate to a public reprimand on the counts filed. The Office of Lawyer Regulation (OLR) rejected his offer, asking a referee to recommend the more stringent sanction of a 90–day license suspension. After a hearing, the referee recommended a public reprimand, and that is the sanction approved by this court. Nevertheless, the court imposes the full cost of prosecuting the case, meaning that Attorney Konnor is required to pay the cost of OLR's unsuccessful effort to secure a higher sanction.

¶ 95. The majority attempts to cushion this determination with an explanation that our court has asked the Board of Administrative Oversight to review the assessment of costs in attorney discipline cases and to present proposals for reform in the future. Until then, the court appears committed to eschewing its discretion under SCR 22.24(1) (2002) and assessing full costs to disciplined attorneys, irrespective of the merit in their arguments. This necessitates comment.

I

¶ 96. The lawyer regulation system exists "to carry out the supreme court's constitutional responsibility to supervise the practice of law and protect the

public from misconduct [and incompetence] by persons practicing law in Wisconsin." SCR 21 Preamble. The Office of Lawyer Regulation has been given the lead role in investigating and prosecuting attorney discipline cases. OLR does vital work for our court and the public, and it enjoys the confidence and support of the full court.

¶ 97. This cannot mean, however, that OLR is unaccountable. The Wisconsin Supreme Court should not be expected to rubberstamp every determination made by other players in the lawyer regulation system. This court has the final word on attorney discipline and discretion whether to impose "all or a portion of the costs of a disciplinary proceeding," SCR 22.24(1), or a reinstatement proceeding. SCR 22.29(5). At present, the court has been unwilling or unable to formulate a set of principles to assist in exercising this discretion.

## II

¶ 98. "Under the American Rule, the parties to a lawsuit bear the cost of their own attorney fees absent legislative authorization to shift costs." *Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2004 WI 112, ¶ 17, 275 Wis. 2d 1, 683 N.W.2d 58 (citing *Buckhannon Bd. & Care Home, Inc. v. W.Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001); *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983); *Kremers-Urban Co. v. Am. Employers Ins. Co.*, 119 Wis. 2d 722, 744, 351 N.W.2d 156 (1984)). The Wisconsin legislature has authorized courts to shift costs and award attorney fees to successful litigants in a number of specific situations.

¶ 99. In addition, the legislature has authorized parties to a lawsuit to make settlement offers as a means to promote settlements and control costs. Wis.

318

Stat. 807.01 (2003–04).[1] For instance, a defendant may serve upon a plaintiff an offer of judgment to be taken against the defendant, and "If the offer of judgment is not accepted and the plaintiff fails to recover a more favorable judgment, the plaintiff shall not recover costs but defendant shall recover costs to be computed on the demand of the complaint." Wis. Stat. 807.01(1).

¶ 100. The lawyer regulation system does not follow the American Rule. In attorney discipline cases, this court is imposing full costs on a respondent attorney even when the attorney has been partially or substantially successful or OLR has failed to recover "a more favorable" determination than the attorney offered. With very rare exceptions, the only time an attorney escapes the imposition of full OLR costs is when the attorney secures dismissal of all OLR counts. Even in these cases the attorney must shoulder his or her own expenses. The effect of this practice is to eliminate virtually all accountability for OLR in terms of overcharging, over-litigating, or failing to prove its case.

¶ 101. SCR 22.24(1) provides that the supreme court *may* assess all or a portion of the total costs of a disciplinary proceeding to a respondent attorney. Thus, the assessment is not mandatory. When a respondent attorney prevails on many or most issues in a case but is assessed the total costs of the proceeding, the attorney does not receive the benefit of the discretion that is built into the rule.

### III

¶ 102. In recent years, I have repeatedly expressed concern about the costs imposed in attorney

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version, unless otherwise noted.

discipline cases. *See OLR v. David V. Penn,* 2002 WI 5, 249 Wis. 2d 667, 638 N.W.2d 287; *OLR v. Leslie J. Webster,* 2002 WI 100, 255 Wis. 2d 323, 647 N.W.2d 831; *OLR v. James Paul O'Neil,* 2003 WI 48, 261 Wis. 2d 404, 661 N.W.2d 813; *OLR v. Marvin E. Marks,* 2003 WI 114, 265 Wis. 2d 1, 665 N.W.2d 836; and *OLR v. Michael G. Trewin,* 2004 WI 116, 275 Wis. 2d 116, 684 N.W.2d 121. The circumstances in these cases varied substantially, but the result was always the same: full costs to the attorney.

¶ 103. At least twice, in *Penn* and *Webster,* OLR utilized procedures that increased costs. In *Penn,* the attorney sought reinstatement *before* the restructuring of the lawyer discipline system, but regulators held up his case until he became ineligible for review by a district professional responsibility committee. Although no one opposed the attorney's reinstatement, his case was assigned to a referee, and OLR retained counsel. The attorney was forced to pay the increased costs, plus the cost of litigating issues under OLR's new rules. The total assessment was more than $6800.

¶ 104. In *Webster,* the court imposed more than $9100 in costs on an attorney who sought but failed to gain reinstatement. OLR first rejected the favorable recommendation of a district professional responsibility committee, then insisted on repeating the reinstatement review process under the referee system to obtain a different recommendation. The attorney was finally reinstated in 2004, after incurring additional costs of $5300.

¶ 105. Several cases appear to have been over-litigated. For example, in *O'Neil,* the attorney was given a public reprimand. Although the referee concluded that the attorney "cooperated fully with the OLR" and

showed a cooperative attitude toward the proceedings, he was assessed costs of more than $11,400.

¶ 106. In *Marks,* OLR waited almost three years after a grievance was made before it filed a complaint. Then it pursued the case adamantly. To illustrate, the referee dismissed two counts involving alleged violations of another state's rules. OLR appealed and prevailed before this court, but its victory added nothing to the attorney's discipline, only his costs. The assessed costs for a 60–day suspension exceeded $22,000.

¶ 107. In *Trewin,* OLR filed 12 counts of misconduct against the attorney. Some of these counts alleged multiple violations against multiple clients. The attorney did not dispute some counts, challenged portions of other counts, and resisted more than he might have if the desired discipline had not been so severe.[2] He succeeded in defeating parts of several counts, securing total dismissal of one count, and winning a significant reduction in the recommended discipline, but was required to pay the entire cost of the proceeding which amounted to more than $25,000.

¶ 108. In another case decided today, *OLR v. Steve J. Polich,* 2005 WI 36, 279 Wis. 2d 266, 694 N.W.2d 367,

---

[2] In my opinion in the *Trewin* case, I stated that "the complaint against Trewin at the outset was so open-ended that he had no idea what discipline OLR was seeking, or what the potential consequences would be if he simply conceded every count." *OLR v. Michael G. Trewin,* 2004 WI 116, ¶ 57, 275 Wis. 2d 116, 684 N.W.2d 121 (Prosser, J., concurring/dissenting). In retrospect, I must acknowledge that that statement is not correct. The complaint, dated December 12, 2002, asked that "the Court impose discipline commensurate with the severity of Trewin's misconduct," but OLR apparently advised Trewin in another document that it was seeking a one-year suspension. This discipline turned out to be more than twice the discipline recommended by the referee.

the attorney is given a public reprimand after beating back five of seven counts filed by OLR, as well as OLR's recommendation of a nine month suspension. He is nonetheless required to pay the full cost of $17,500. Again, the court declines to apportion costs by exercising its discretion.

## IV

¶ 109. In my view, these cases demand a serious review of procedures in the lawyer regulation system. The overriding question for me is whether practices and procedures in the system can be revised to achieve the system's goals at less cost and greater fairness to all parties.

¶ 110. It should be noted that some attorneys have tenaciously fought OLR discipline, at enormous expense, without justification. I have no difficulty assessing these attorneys with full costs (although I am somewhat skeptical whether the costs assessed are always paid). If assessed costs in these cases are not paid, OLR is put under tremendous pressure to seek full costs in situations where full costs may not be justified. There should thus be broad interest in revising procedures in the system in ways that will benefit OLR as well as the affected attorneys.

¶ 111. Several policy questions should be addressed. First, what standards should OLR employ when it notifies an attorney what discipline it intends to seek and when, if ever, should the desired sanction be revised?[3] Second, can the lawyer regulation system make increased use of stipulations, partial summary

[3] Under present practice, the OLR staff, especially the director, determines the level of discipline to be sought. As I understand it, the OLR's retained counsel are not permitted to

judgments, and other means to narrow disputes and hold down costs? Third, is there a place for plea agreements in the lawyer regulation system? Fourth, should this court authorize both parties to make offers of settlement similar to the offers under Wis. Stat. § 807.01? Fifth, if plea agreements or offers of settlement are not permitted, should the court establish standards that will discourage overcharging and over-litigating discipline cases? Sixth, what factors should this court consider when a disciplined attorney moves to reduce full costs? Seventh, should the court consider financial penalties like forfeitures, apart from costs, as one option in attorney discipline cases?

## V

¶ 112. In his concurrence in the *Polich* case, Justice Butler suggested that the case be remanded to the referee for a reasonable apportionment of costs. I believe similar action is warranted here. Referees are usually better positioned than this court to make an initial determination of appropriate costs.

## VI

¶ 113. The concurrence of the Chief Justice responds to the first five sections of this concurrence/dissent. It criticizes my alleged failure in previous writings to propose a formula for apportioning costs[4] and concludes that until appropriate standards

---

negotiate any change in OLR's recommended discipline with the respondent attorney or the attorney's counsel without approval from the director.

[4] I acknowledge that I have never proposed a specific formula for apportioning costs. Instead, I urged colleagues to address the issue collectively. These requests eventually led to

and criteria are adopted, this court will continue to impose all reasonable costs incurred in a disciplinary proceeding against a disciplined attorney and will not reduce costs on an ad hoc basis. *See* Chief Justice Abrahamson's concurrence, ¶ 56.

¶ 114. The question of how to assign costs in attorney discipline cases is not an easy one. In all likelihood, there is no single all-purpose answer. My failure to propose a solution does not absolve the court of its duty to seek a solution. It would be a mistake to assume that no one outside of our chambers cares about the attorney cost issue.

the court's request for input from the Board of Administrative Oversight. In *OLR v. Steve J. Polich*, 2005 WI 36, 279 Wis. 2d 266, 694 N.W.2d 367, I joined Justice Butler in suggesting that the referee be delegated authority to apportion costs.